Argued February 6, affirmed July 3, 1957

# CASE *v.* CHAMBERS ET AL
314 P. 2d 256

*Alfred B. Thomas,* Assistant Attorney General, Salem, argued the cause for appellants. With him on the briefs were Robert Y. Thornton, Attorney General, and Theodore W. de Looze, Assistant Attorney General, Salem.

*Virgil Crum* argued the cause for respondent. On the brief were Crum, Walker & Buss, Portland.

Phillips, Coughlin, Buell & Phillips, and Alfred H. Stoloff; Sabin, Dafoe & Newcomb; Hart, Spencer, McCulloch, Rockwood & Davies, and Frederick H. Torp; Rosenberg, Swire & Coan; and Hutchinson, Schwab &

Burdick, all of Portland, filed a brief as amici curiae, urging affirmance.

KESTER, J.

This is a proceeding to review an order of the State Tax Commission increasing the assessed value of the machinery and parts inventory of petitioner, J. I. Case Company, for the years 1951 and 1952.

In those years the company filed with the assessor of Multnomah county its returns of personal property as of January 1, 1951, and January 1, 1952, respectively, as required by ch 342, Oregon Laws 1949 (ORS 308.290). The returns listed the company's Portland branch inventory of machinery and parts at total values which are hereinafter set forth. On the basis of those returns the inventories were assessed, and the company paid the taxes required by such assessments. Thereafter, by letter dated August 31, 1953, the assessor and sheriff jointly notified the company of their intention to add to the assessment roll and the tax roll for those years certain amounts as omitted merchandise inventory, acting under § 110-821, OCLA, as amended by ch 442, Oregon Laws 1949, and ch 577, Oregon Laws 1951 (now ORS 311.210). The amounts stated in the letter were as follows:

| | "1952 January 1st | 1951 January 1st |
|---|---|---|
| "Per Books | $302,111.00 | $201,372.98 |
| Filed Inv. | 116,325.00 | 104,049.81 |
| Omitted Inv. | 185,786.00 | 97,323.17 |
| Assessed Value of Omitted Inv. | 100,320.00 | 58,390.00"[1] |

[1] It will be noted that "omitted inventory" is the difference between "per books" and "filed inventory." According to the commission's brief the "assessed value of omitted inventory" was 60 per cent for 1951 and 54 per cent for 1952.

In response to the notice the company appeared and objected to the increase, but the objections were overruled and the additional assessment was made. This resulted in additional taxes for 1951 in the sum of $3,293.20 and for 1952 of $5,407.25, which amounts apparently were paid by the company under protest. The company appealed to the State Tax Commission for relief from the additional assessment, and after a hearing the commission entered its opinion and order dated November 15, 1954 (No. AT-54-85), which denied the requested relief. This proceeding was then commenced in the circuit court to review the commission's order, and by decree entered May 10, 1956, the circuit court set aside the additional assessment and directed refund of the additional taxes paid, with interest at 6 per cent from the date of payment. From that decree the commission has appealed.

The questions presented are:

(1) Is a manufacturer's inventory embraced within the term "merchandise stock in trade," as used in ch 577, Oregon Laws 1951 (ORS 311.210)?

(2) If so, was the commission correct in determining the "true cash value" of petitioner's inventory to be its factory cost, as shown by petitioner's books, and in assessing the difference between that figure and the reported value as "omitted property"?

(3) If the commission was wrong, and petitioner is entitled to a refund of taxes paid, will the refund bear interest?

On the first of these questions a brief has been filed by amici curiae, who represent a number of other manufacturing concerns having similar questions pending.

Petitioner, J. I. Case Company, is engaged in the manufacture and sale of farm machinery. Its home of-

fice is in Racine, Wisconsin, and it maintains numerous branches throughout the world, including one in Portland, which serves Oregon, Washington, and northern Idaho. The company sells its products to local dealers, who in turn sell to farmers, and generally the machines are shipped from the factories directly to the dealers in carload lots. Besides general supervision, the branch houses serve the dealers by carrying a stock of machinery and parts to supplement those which the dealer obtains from the factory. Generally it is uneconomical for a dealer to order large quantities from the branch, instead of from the factory, because he has to absorb the freight charges, and it costs more to ship from the factory to the branch and then reship to the dealer than it does to ship directly from factory to dealer in the first place. Therefore, the branch stock of machines and parts serves only as a reserve or emergency supply.

Some of the branch stock is "fast-moving" and of current models, so that if a dealer's stock is temporarily depleted he can obtain a machine or part quickly, without waiting for a factory shipment. And some of the branch stock is "slow-moving" and of older models, for which there would not be enough current demand to justify the dealer in keeping a complete stock.

When a particular model of a machine is discontinued, or replaced by a newer one, the older models are sold to the dealers at a discount; or if they prove unsaleable, they are eventually scrapped for junk. When a model is changed, the branch house is usually "stuck" with the old ones left on hand. So long as some of the older models are in use in the field, however, it is necessary to maintain a supply of replacement parts for them. Therefore, before a given model is discontinued, the factory makes up a supply of parts

sufficient to service the outstanding machines during the remainder of their expected life. The future need for such parts cannot be estimated accurately, so the quantity made may be larger than is ultimately required. This reserve of parts for older models is maintained at the branch warehouses, and as the number of the older machines in use in the area gradually dwindles, the company adjusts its parts inventory by moving the parts to other branches where there may be more demand, or by scrapping the parts for junk. Some of such parts are carried for as much as 20 or 30 years against a need that may never materialize.

While these parts are sold at current prices, fixed by the factory, they have little market value in the ordinary sense, because of the limited market. They are saleable only when one of the old machines breaks down. Mr. Wickwire, petitioner's Portland branch manager, testified that it costs more to carry the inventory of parts than the actual profit made on sales. The only purpose of maintaining the parts inventory at the branch is to promote good will by being able to service the old machines in case of emergency.

The evidence indicates that a substantial portion of the branch inventory consist of items which are out of date, and for which there is little or no demand. For example, the 1951 parts inventory was checked against the sales of parts for the five years from 1949 to 1953, inclusive, and it was found that of the 8,580 items on hand in 1951, 2,771 items, or approximately 33 per cent of the total inventory, were obsolete or slow-moving. Of these, there were 1,436 items (or 52 per cent of the 2,771 classed as slow-moving or obsolete) of which no sales at all were made during the five-year period. A similar analysis of machinery obsolescence showed that of 374 different items, comprising 8,876 units on

hand in 1951, 103 different items (27 per cent), comprising 1,977 units (22 per cent), were slow-moving or obsolete. Of these 1,977 units, the company sold 576 units (or 29 per cent) during the three-year period 1951-1953, inclusive; and in 1954 it still had on hand 1,401 units, or 71 per cent, of those that were inventoried in 1951. There were 41 items (40 per cent of the 103 classed as slow-moving or obsolete) of which no sales were made during the 1951-1953 period.

Of the parts and machines listed on the 1951 inventory, items totalling $85,153.82 were either scrapped or returned to the factory during the three years 1951-1953. Likewise during that period sales allowances were credited to dealers' accounts on sales by them of certain older machines in the amount of $40,-037.50; and certain price reductions were made on machines sold from the branch stock totalling $20,438. These figures are based on dealers' prices, which are the prices at which all items are carried on the branch books, as distinguished from the factory cost price. While it is true, as pointed out by the commission in its order, that goods returned and scrapped during the year, or sold from the branch stock, are reflected in a diminishing of the year's ending inventory, and that sales allowances on machines in dealers' hands have no effect on other machines in the branch stock, still these figures tend to corroborate petitioner's claim that there is a substantial factor of obsolescence to be considered with respect to items in the branch stock.

In making the original returns, petitioner took the branch inventory, at dealers' cost, and reduced the total by a certain percentage reflecting obsolescence. It did not attempt to determine obsolescence with respect to each particular item; and the record does not show either the total amount of the inventory, at

dealers' cost, nor the percentage used for obsolescence. It did not take into account any scrap value as such. However, Mr. Wickwire testified that in his opinion the resultant figure represented the true cash value of the inventory.

The county, on the other hand, requested from the factory a certificate as to the book value of the inventory, and the factory supplied the figures as to book value quoted above from the letter of August 31, 1953. These book value figures represented the original factory cost of the inventory (which is lower than dealers' cost), and it is undisputed that the book value does not make any allowance for obsolescence or depreciation of items on hand. The county, and now the commission, contend that this book value is the best measure of true cash value.

The commission admits that obsolescence is a factor which must be recognized, but it contends that obsolescence was reflected in the book value of the inventory because the inventory diminished as items were scrapped or returned. This, of course, makes no allowance for obsolescence of items still on hand, and it assumes that all of the parts and machines on hand still retained their original value, no matter how old or out-of-date they might be. The commission in its order found that "No obsolescence was shown for either of the tax years involved," and it directed the sheriff "to make no allowance for obsolescence in the taxpayer's inventory for the tax years 1951-52 and 1952-53."

To give a complete picture, although not relevant to the present inquiry, it should be noted that the commission granted a reduction in the assessed value of petitioner's 1951 inventory equal to 16 2/3 per cent of

its full assessed value, for the purpose of placing this company's property on the roll at an assessed value uniform with those which the assessor established for all other property in the same and other classes for 1951. This percentage had been applied in the commission's orders in the appeals of 27 other inventory property owners (Nos. AT-51-10 to and including AT-51-21 and AT-51-23 to and including AT-51-38). The commission's order in this case states that application of this reduction results in an assessed value of the inventory for 1951-1952 of $100,685.[2]

1. *Applicable Statutes*

Before considering the merits, it will be well to review briefly the statutes in effect at the pertinent times. By § 110-101, OCLA (now ORS 307.030), all tangible personal property situated within the state, except as otherwise provided by law, is subject to assessment and taxation in equal and ratable proportion. Section 110-103, OCLA (now ORS 307.020), defines "tangible personal property" to mean and include "all chattels and movables, such as boats and vessels, merchandise and stock in trade * * * etc."

All personal property is to be assessed at its true cash value as of January 1 (§ 110-348, OCLA, as amended by ch 381, Oregon Laws 1947, now ORS 308.232), and "true cash value" is defined as follows:

> "True cash value of all property, whether real or personal, shall be held and taken to mean the amount such property would sell for at a voluntary sale made in the ordinary course of business, taking into consideration its earning power and usefulness

---

[2] This is apparently reached by applying the 16⅔ per cent reduction to the book value of $201,372.98, and then further reducing the result by applying the 60 per cent ratio for 1951.

under normal conditions." § 110-335, OCLA, as amended by ch 440, Oregon Laws 1941.[3]

The statutes make it the duty of the assessor to ascertain the persons and property assessable, to make out the assessment roll, and to appraise the property thereon (§ 110-344, OCLA, as amended by ch 359, Oregon Laws 1941, now ORS 308.230). He shall enter on the assessment roll, among other things, the true cash value of all taxable personal property (§ 110-336, OCLA, as amended by ch 76, Oregon Laws 1947, and ch 542, Oregon Laws 1951, now ORS 308.215).

The taxpayer is required to make a return of all his taxable personal property, with a statement of its true cash value; and upon failure of the taxpayer to make such return, the assessor shall list and evaluate the property from the best information obtainable from other sources. It is expressly provided that "No return shall be controlling on the assessor in any respect in the assessment of any property" (§ 110-349, OCLA, as amended by ch 359, Oregon Laws 1941, ch 342, Oregon Laws 1949, and ch 218, Oregon Laws 1953, now ORS 308.290). To aid in his assessment function, the assessor is given broad powers of discovery, examination of witnesses, requiring reports, etc. (§ 110-608, OCLA, cf. ORS 308.285, 308.316).

The assessment roll is reviewed by the board of equalization, which has power to raise or lower assess-

---

[3] Chapter 701, Oregon Laws 1953, changed the definition to read as follows:

"True cash value of all property, whether real or personal, shall be held and taken to mean the amount such property would sell for at a voluntary sale made in the ordinary course of business, under normal conditions, in accordance with rules and regulations promulgated by the State Tax Commission."

Under this Act the commission adopted regulations, effective January 1, 1954, for valuing an inventory, which are referred to in the commission's brief. Chapter 691, Oregon Laws 1955, effective January 1, 1961, adopted a standard of market value or just compensation, leaving the methods and procedures entirely up to regulations of the commission. None of the definitions or methods referred to in this note is involved in this case.

ments, assess omitted property, and otherwise correct and equalize the roll (§§ 110-402, 110-404, OCLA, as amended by ch 440, Oregon Laws 1941, ch 46, Oregon Laws 1945, ch 448, Oregon Laws 1951, ch 714, Oregon Laws 1953, ch 709, Oregon Laws 1955, now ORS 309.038, 309.080). The assessment rolls of the various counties are then reviewed and equalized by the State Tax Commission, which has power to require the county boards of equalization to raise or lower the valuation of any taxable property and to add property to the assessment roll, and if the county board fails to comply, the commission itself may make the correction or change in the assessment roll (§ 110-603, OCLA, now ORS 309.400).

After the equalization procedure has been completed, and the various tax-levying bodies have made their levies, the assessor divides the assessed valuation into the total amount of money to be raised, to determine the rate per cent of tax applicable to all taxable property (§§ 110-705, 110-809, OCLA, ORS 310.090, 310.100). When the taxes have been apportioned and extended on the assessment roll, the assessor certifies the amounts chargeable on the taxable property of the county, and the county clerk issues and attaches a warrant for collection, after which the assessment roll becomes a tax roll in the hands of the sheriff as tax collector (§ 110-804, OCLA, ORS 311.105, 311.115). The taxes so levied are liens on the property (§ 110-829, OCLA, as amended by ch 440, Oregon Laws 1941, ch 357, Oregon Laws 1945, ch 62, Oregon Laws 1949, ch 707, Oregon Laws 1953, ch 720, Oregon Laws 1955, ORS 311.405), and as to personal property the tax is a debt due and owing from the owner (§ 110-839, OCLA, ORS 311.455).

The statute giving rise to this litigation is § 110-821,

OCLA, as amended by ch 442, Oregon Laws 1949, and ch 577, Oregon Laws 1951 (now ORS 311.210). Its importance warrants setting forth a portion of it in full:

"(1) Whenever, after the return of the assessment rolls to the county assessor by the board of equalization, the officer having the possession of the roll shall discover or receive credible information, or if he has reason to believe that any real or personal property, or any buildings, structures, improvements or timber on land previously assessed without the same, has from any cause, been omitted, in whole or in part, in the assessment of any year or number of years not exceeding five years prior to the last roll so equalized and returned, or from the assessment roll or the tax roll, he shall proceed to correct the assessment or tax roll in his hands, and add such property thereto, with the proper valuation, and charge such property and the owner thereof with the proper amount of taxes thereon at the rate which the said property would have been taxed had it been properly upon the tax roll for the year or years as to which it was omitted; to enable which officer so to do he hereby is invested with all of the powers of the assessor, board of equalization and county clerk under the laws in force during such years and thereafter. *Whenever the officer having possession of the roll shall discover that the valuation as of the day of assessment, of any merchandise stock in trade, exceeds the valuation as stated in the taxpayer's return thereof and the true cash value as found by the assessor, such excess shall be presumed to be omitted property subject to additional assessment as provided herein.* Where such omitted property consists of any building, structure, improvement or timber which has been severed or removed from the land, the tax on the omitted property shall be charged against the land, except that the tax for a prior tax year shall not accrue against the land if before the assessment date for that tax year

the land was transferred to a bona fide purchaser. No such tax shall be charged against any omitted property itself for any prior tax year if before the assessment date for that tax year such omitted property was transferred to a bona fide purchaser.

"(2) Before making such corrections or additions such officer shall give the person claiming to own said property or occupying it or in possession thereof notice in writing mailed to his last-known address of his intention to add such property to the assessment or tax roll describing it in general terms, and requiring such person to appear at a specified time, not less than 20 days after mailing such notice, and to show cause, if any, why such property should not be added to the assessment and tax roll; and if the party so notified does not appear, or if he appears and fails to show any good and sufficient cause why such assessment shall not be made, the same shall be made, and the officer making the correction or addition shall file in his office a statement of the facts or evidence on which he made such correction. Appeal on any issue of law or fact may be taken from the action of the officer in making the correction or addition by the person aggrieved within 10 days after the action of such officer is taken, by giving notice to such officer and otherwise proceeding in the manner provided for appeals from the board of equalization. * * *" (Italic ours.)

The italicized language was added by the 1951 amendment. It will be noted that prior to that amendment the section dealt only with the situation where taxable property was actually omitted from the assessment roll. The amendment deals with undervaluation of property which was in fact included on the roll. By a legal fiction it is declared that the amount of the undervaluation shall be presumed to be omitted property.

Anticipating a later portion of this opinion, we note

that the 1955 legislature, after this litigation had arisen, amended "merchandise stock in trade" to read "inventories, merchandise and stock in trade" (ch 720, Oregon Laws 1955).

2. *The Role of the Courts*

The appeal procedure mentioned in § 110-821, OCLA, originally referred to §§ 110-609 and 110-610, OCLA, which were repealed, and a new procedure prescribed by ch 708, Oregon Laws 1953 (now ORS 306.510 et seq.). In this case the action of the sheriff in making the omitted property assessment was on November 19, 1953, and review therefore is governed by the 1953 Act. Reference to that Act will be made as the sections appear in ORS.

It will be recalled that ORS 311.210 provides that an appeal from an omitted property assessment shall be "in the manner provided for appeal from the board of equalization." Appeals from the board of equalization to the Tax Commission are governed by ORS 306.515 and ORS 306.525 to 306.540, inclusive. When it comes to appeals from the Tax Commission to the courts, there appears to be a choice of procedures. ORS 306.510 provides for appeals from orders of the Tax Commission made in the exercise of its general supervisory jurisdiction (ORS 306.090 and 306.130); while ORS 306.545 to 306.555, inclusive, provide for appeals from orders of the Tax Commission made upon findings of fact and conclusions of law under ORS 306.535. The parties have treated this case as coming under the latter sections, and we will so regard it.

While appeals under ORS 306.510 "shall be heard and determined by the court in a summary manner as a suit in equity," the procedure for review under ORS 306.545 to 306.555, inclusive, is not clearly defined

as being analogous either to suits in equity or actions at law. ORS 306.555 provides:

"(1) The review shall be conducted by the circuit court without a jury and shall be confined to the record before the court, except that in cases of alleged irregularities in procedure before the commission, testimony thereon may be taken in the court. The findings and order of the commission shall carry a prima facie presumption of validity, and the court may affirm the order of the commission, or may reverse, modify or remand it if the substantial rights of the petitioner have been prejudiced.

"(2) In case of modification, reversal or remanding by the circuit court, the court shall make special findings based upon evidence in the record indicating clearly all respects in which the commission's order is erroneous."

Unlike § 110-610, OCLA, which preceded it, the present statute does not limit the questions open to court review. See *In Re Ge Bauer Apts.*, 170 Or 47, 49, 131 P2d 962. Nor does the present statute continue the former provision that in the event of overvaluation or disproportion, the court "shall set aside such assessment and determine the correct assessed valuation thereof." Under that provision (and similar language in ORS 308.630) it was held that the court did not step into the shoes of the assessor, but merely reviewed the evidence to determine whether the taxpayer, in attacking the assessment, had produced evidence to overcome the presumption that the assessor had properly performed his official duties. Compare the language of Mr. Justice Brown's specially concurring opinion in *Smith Securities Co. v. Multnomah County,* 98 Or 418, 427-431, 192 P 654, 194 P 428, with *Appeal of Kliks,* 158 Or 669, 686, 76 P2d 974, and *Tax Com-*

*mission v. Consumers' Heating Co.*, 207 Or 93, 110-112, 294 P2d 887.

■ While the scope and manner of review under the present statute are not free from doubt, in the absence of a more specific direction, we construe the "prima facie presumption of validity" mentioned in ORS 306.555 as the equivalent of the presumption of official regularity which was applied under the former statute. And the provision empowering the court to "affirm * * * reverse, modify or remand" permits the court itself, in the event the presumption is overcome, to determine the correct assessment, if the record is sufficient, or to set aside the additional assessment altogether, or to remand it to the commission for correction in the light of such guiding principles as the court may lay down.

Either under the procedure of ORS 306.510 or that set forth in ORS 306.545 to 306.555, appeals from the circuit court to the Supreme Court are governed by ORS 306.570, which provides that appeals to this court shall be taken as in "other civil cases." The latter phrase fails to recognize the fundamental differences in appellate review between actions at law and suits in equity; but Rule 1 of the rules of this court provides that the mode of review, when not specifically pointed out by statute, shall be by appeal as in actions at law.

The commission has proceeded as in an action at law and has filed with this court a bill of exceptions which incorporates by reference the transcript of testimony and exhibits introduced at the hearing before the commission's hearing officer, and which constituted the entire factual record in the circuit court. That record consisted only of evidence offered by the petitioner, as the county relied solely on "book value" or

the admitted factory cost, and it rested at the close of petitioner's case, without offering evidence.

The trial court entered findings of fact and conclusions of law, the gist of which was that book value or factory cost, as used by the county and approved by the commission, was not a fair measure of true cash value, as it made no provision for obsolescence of items on hand. The trial court concluded that, while book value was some evidence of true cash value and established a prima facie case, that prima facie case was overcome by petitioner's evidence, leaving the ultimate burden of proving true cash value on the commission. Since the commission offered no evidence of value other than factory cost, the trial court held that the original assessment must be assumed to have been proper, and the additional assessment was set aside.

The petition for review of the commission's order listed numerous objections, including lack of uniformity and denial of equal protection of the laws. However, the only questions briefed or argued on appeal are the three listed at the beginning of this opinion, and we will limit our consideration to those. The commission submits two assignments of error:

(1) That the circuit court erred in striking the additional assessment from the rolls; and

(2) That it erred in allowing interest on the refund.

The first of these involves both the applicability of the presumption in the omitted property statute to petitioner's inventory and also the validity of factory cost as a measure of true cash value under these circumstances.

3. *Merchandise Stock in Trade*

The trial court made no specific finding or conclusion as to whether petitioner's inventory of machinery

and parts constituted "merchandise stock in trade" as referred to in the omitted property statute (§ 110-821, OCLA). It was apparently assumed that the statute applied, for otherwise it would have been unnecessary to consider the question of valuation.

Petitioner and amici curiae contend that "merchandise stock in trade" means the stock in trade of a merchant, and that it applies only to goods bought and sold without further application of labor or materials, and as to which there is a continuous turnover. Petitioner apparently concedes that the inventories in question are a part of its "stock in trade," but contends that the phrase "stock in trade" is not an independent class, but is modified and limited by the word "merchandise." It is contended that a manufacturer's inventories are not "merchandise," and therefore cannot be "merchandise stock in trade."

■ The commission contends that the phrase "merchandise stock in trade" is ambiguous and requires construction; and it argues that we should insert a comma or the conjunction "and" between "merchandise" and "stock in trade" on the assumption that the legislature intended the phrase to mean two separate classes, as in the general definition of personal property (ORS 307.020).⁴ The commission contends that "merchandise" was used as a noun, rather than as an adjective, and it concedes that treating it as an ad-

---

⁴ In the appeal of M & M Woodworking Co., where the same question was raised, the tax commission said:

"It is the opinion of the Commission that the legislature in amending section 110-821, O.C.L.A., in 1951 inadvertently omitted the conjunction 'and' in the phrase 'merchandise stock in trade'. The phrase is therefore construed to read 'merchandise and stock in trade' which is the same phrase found in section 110-103, O.C.L.A. (ORS 307.020) which defines personal property. The term 'merchandise' includes finished goods in the hands of merchants, either wholesale or retail; and the term 'stock in trade' includes materials, manufacturers' supplies, work in process and finished stock in the hands of the manufacturers." (Opinion and order No. AT-55-66, March 6, 1956.)

jective "would probably result in excluding manufacturer's inventories from the operation of the presumtion" (i.e., the presumption that an undervaluation constitutes omitted property).[5] Such a result, according to the commission, might render the statute unconstitutional by classifying "manufacturers" differently from "merchants."

Amici curiae aptly point out that the commission's construction in reality would require us to insert the word "or" between "merchandise" and "stock in trade," rather than either a comma or the word "and" because use of a conjunction would require that the goods be both "merchandise" and "stock in trade" in order to qualify. This would have the same effect as if "merchandise" were used as an adjective in the first place. Amici curiae also cite grammarians to the effect that a noun may be used as an adjective, and they list numerous instances where the word "merchandise" is so used.

The commission has cited no authority, either for the proposition that a tax classification distinguishing between merchants and manufacturers would be unconstitutional, or with respect to the meaning of the phrase "merchandise stock in trade." Amici curiae cite numerous cases apparently holding that such a classification is valid, but in the view we take of the case it is unnecessary to decide the constitutional question.

With respect to the meaning of "merchandise stock in trade," petitioner and amici curiae cite a number of cases holding that Bulk Sales Acts, which use the term "stock of merchandise" or similar expressions, do not apply to manufacturers. *Off v. Morehead,* 235

---

[5] We do not regard this admission as to the interpretation of a statute to be binding upon the state of Oregon. See State Highway Comm. v. Rawson, decided June 19, 1957.

Ill 40, 85 NE 264; *Frederick v. Dettary,* 318 Mich 252, 28 NW2d 94; *Swift v. Tempelos,* 178 NC 487, 101 SE 8; *Axtell v. Word* (Tex Civ App) 29 SW2d 421; *Tomforde v. Mitchell* (Tex Civ App) 91 SW2d 1137; *In Re Saraw,* 91 F2d 957 (2d Cir); See Annotation 168 ALR 735. Because of the different purpose of the Bulk Sales Acts, as compared to a taxing statute, the definitions in those cases are of little value here.

Another line of cases is cited by petitioner and amici curiae holding that a manufacturer is not within the scope of statutes imposing taxes upon "merchants" or "dealers." *Chattanooga Plow Co. v. Hays,* 125 Tenn 148, 140 SW 1068; *City of Bolivar v. Ozark Utilities Co.,* 238 Mo App 860, 191 SW2d 368; *Commonwealth v. Meyer,* 180 Va 466, 23 SE2d 353; *People v. Stevens,* 10 Cal App2d 763, 51P2d 1179; *State v. San Patricio Canning Co.,* (Tex Civ App) 17 SW2d 160; *United Biscuit Co. v. Stokes,* 174 Tenn 111, 124 SW2d 230. These are not persuasive either, because the fact that a manufacturer is not a "merchant," within the meaning of those statutes, does not mean that the finished products of the manufacturer, when stored and held by it for sale, are not "merchandise." Furthermore, in some of the cases above cited (*Chattanooga Plow Co. v. Hays, United Biscuit Co. v. Stokes,* and *Commonwealth v. Meyer*) the statute expressly distinguished between manufacturers and merchants.

■ We agree with petitioner's contention that in this instance the legislature has used the word "merchandise" as an adjective, or attributive noun, modifying "stock in trade." We do not think the phrase is so ambiguous as to require us to insert additional words or punctuation, nor to call for the application of either strict or liberal construction. It does not necessarily

follow, however, that petitioner's branch inventories are excluded.

The parts and machines which petitioner maintains at its Portland branch are there for the purpose of sale. So far as the evidence shows, they are sold in the same form in which they are kept in the warehouse. While petitioner comments at length upon the service aspect of its parts business, it does not appear that petitioner itself services machines in the field, or that the service is a part of the original sale of the machine. On the contrary, the evidence indicates that when a farmer needs a replacement part, petitioner sells the part to a dealer, who resells to the farmer, and the farmer apparently installs the part himself. In any event the sale of parts, and the maintenance of a reserve supply of parts for old machines, are apparently necessary incidents to the sale of machines.

■■ There is no doubt that petitioner's inventories are subject to ad valorem taxation; and the omitted property statute, insofar as it deals with property actually omitted from the roll, applies to all forms of property, real or personal. The only question is whether this property is within the 1951 amendment by which an undervaluation is treated as if it were an omission. For that purpose, we see no reason why a manufacturer's finished products, held for sale by it, are not "merchandise stock in trade," just as much as the same items would be if in the hands of petitioner's dealers.

■ Petitioner argues that goods in the hands of a retail merchant normally have a rapid turnover, and of the total goods handled in a year, only those present on the assessment date bear the tax; while some of the goods in question here, having a slow turnover, are taxed repeatedly in successive years. But that argument goes to the policy of taxing these goods at all,

rather than to the limited question of whether an undervaluation should be treated as an omission. In any event, only a portion of petitioner's inventories is of the slow-moving variety; and the mere fact that some items have a slow rate of turnover cannot change their essential character or differentiate them from the balance.

We hold, therefore, that petitioner's inventory of parts and machines at its Portland branch constituted "merchandise stock in trade," within the meaning of § 110-821, OCLA.

## 4. *True Cash Value*

We come now to the question of valuation, and particularly, whether factory cost is a fair measure of true cash value in these circumstances. To recapitulate, the county relied on petitioner's factory cost, and it did not offer other evidence of value. Petitioner offered evidence to show that the inventories were subject to obsolescence, which was not reflected in factory cost; and petitioner reported values based on dealers' cost less a deduction for obsolescence. Since the record does not show the dealers' cost, nor the amount or percentage deducted for obsolescence, nor the mark-up between factory cost and dealers' cost, it is impossible for us to correlate the petitioner's figures with those of the county.

For 1951 the taxpayer's return for the value of the combined parts and machinery inventory was approximately 51% of factory cost. Since factory cost was lower than dealers' cost, we know that the deduction for obsolescence from dealers' cost must have been more than 49% in that year, even though we do not know the dealers' cost. For the same year, as mentioned above, the taxpayer's own analysis of its inventory showed that 33% of the number of parts items and

27% of the number of machinery items were slow-moving or obsolete. If the dealers' cost of the obsolete items was in the same proportion to the dealers' cost of the entire inventory as the number of obsolete items was to the total number of items in the inventory, then the deduction for obsolescence was greater than the dealers' cost of all the items classed as obsolete. In other words, the deduction was greater than if the obsolete items had been treated as completely valueless. But for all we know, the obsolete items may have been the higher-priced ones, so that 33% of the number of parts may in fact have represented over 49% of the dealers' cost of the entire parts inventory. Hence we cannot say from these percentages alone that the depreciation taken was excessive.

While petitioner's manager testified that the amount reported was the true cash value, we cannot attach much weight to that opinion without knowing the cost and depreciation figures upon which it was based. Furthermore, some of his testimony related to liquidation value, and the expected sales price if the entire inventory were sold to one purchaser, which we do not believe accords with the statutory definition of "a voluntary sale made in the ordinary course of business." *Appeal of Kliks,* supra, 158 Or at 689.

In this unsatisfactory state of the record we cannot say which, if either, valuation was correct, and we cannot determine the true cash value ourselves; so the question before us will have to be decided on the basis of presumptions and the burden of proof.

■ We start with the proposition mentioned earlier that the original assessment, upon which the taxes were initially paid, is presumed to be correct. *Northern Pacific Ry. v. Clatsop County,* 74 Or 250, 256, 145 P 271; *In Re Weyerhaeuser Land Co.,* 85 Or 434, 443, 165

P 1164; *Douglas Land Co. v. Clatsop County,* 87 Or 462, 464, 169 P 790; *Citizens Nat. Bank v. Baker County Board of Equalization,* 109 Or 669, 676, 222 P 341; *Appeal of Kliks,* supra, 158 Or 669, 687, 76 P2d 974; *In Re Ge Bauer Apts.,* supra, 170 Or 47, 58, 131 P2d 962.[6]

Petitioner suggests that this presumption is conclusive, because the assessment and levy have the effect of a judgment. While that may be true, so far as collateral attack is concerned, the presumption is not conclusive in a direct proceeding to review the assessment. The cases above cited hold that the assessment is prima facie valid, and that clear and convincing evidence is required to overcome it, thus indicating that on direct review the presumption is rebuttable. *Appeal of Kliks,* supra, 158 Or at 688.

While our reported cases all concern attempts by the taxpayer to overcome the presumption in favor of the assessment, petitioner claims that the presumption must operate in both directions, and when the assessor himself attempts to impeach the roll by increasing an assessment previously made, he must carry the same burden of proof.

The commission contends that the presumption in favor of the original assessment should not apply when the assessment is based upon the taxpayer's own return. We quote from the commission's brief:

"* * * To say that the same presumption should be accorded assessments which result from a valuation reported by the taxpayer is somewhat

---

[6] Earlier cases, insofar as they allowed an appeal to the Supreme Court from an order of the circuit court on an appeal from a board of equalization were impliedly overruled in Smith Securities Co. v. Multnomah County, 98 Or 418, 426, 192 P 654, 194 P 428, but without affecting their holdings with respect to presumptions and burden of proof. The reason for the Smith decision was removed by enactment of ch 248, Oregon Laws 1927 (now ORS 19.010 (4)), permitting appeals to the Supreme Court in special statutory proceedings.

ridiculous. The result of such a holding places the Assessor or Sheriff in the position of having the presumption operate against them and in favor of the taxpayer."

■ While we recognize the practical convenience of the assessor's relying upon the taxpayer's return in the first instance, the statutes mentioned at the beginning of this opinion clearly place upon the assessor an independent duty of determining for himself the true cash value of the taxable property in his jurisdiction. The taxpayer's return is not controlling upon him in any respect, and in the absence of a return he must list and evaluate the property from the best information obtainable from other sources, for which duty he is given ample powers of discovery. Therefore, we cannot assume, as the commission asserts, that "the assessor accepts the reported value without in fact finding the actual true cash value." On the contrary, we must presume that the assessment roll represents an actual determination of value by the assessor, and that if he adopts the values shown by the taxpayer's return, it is because those values also reflect the independent judgment of the assessor. Therefore, we think that the presumption in support of the assessment roll must operate in favor of the taxpayer, as well as against him.

We take no position at this time as to whether the taxing authorities must produce "clear and convincing" evidence in order to overcome the presumption, as the taxpayer would have to do if he were attacking the assessment.

The next presumption to be considered is the one found in the 1951 amendment to the omitted property statute (§ 110-821, OCLA):

"* * * Whenever the officer having possession of the roll shall discover that the valuation as

of the day of assessment, of any merchandise stock in trade, exceeds the valuation as stated in the taxpayer's return thereof and the true cash value as found by the assessor, such excess shall be presumed to be omitted property subject to additional assessment as provided herein."

It will be noted that the word "presumed" in the above excerpt does not relate to the finding of undervaluation, but rather to treating the undervaluation, when found, as omitted property. Hence this presumption does not enter into the question of whether there is in fact an undervaluation.

There is some incongruity introduced by the amendment, because of its commingling of undervaluations with actual omissions. As to omitted property, there is little room for the exercise of judgment—the property is either listed on the roll or it isn't. The officer may institute the proceedings on little more than suspicion ("Whenever * * * the officer * * * shall discover or receive credible information, or if he has reason to believe"). And at the hearing the taxpayer shall "show cause, if any, why such property should not be added to the assessment and tax roll." This contemplates simply the determination of whether or not the property exists, or is owned by the taxpayer; and it does not necessarily attack the accuracy of what is already shown by the roll.

■ As to undervalued property, however, the right of the officer to add the excess to the roll depends upon the fact of undervaluation. Such an inquiry puts the accuracy of the roll necessarily in issue, and the result is, in effect, the modification of a judgment after its entry. For this purpose the word "discover" in the 1951 amendment must mean, not mere grounds to believe, but the actual determination that there has been

an undervaluation, after notice and hearing. As to this, the taxing authorities have the affirmative of the issue, and the presumption in favor of the original assessment puts the burden on the county to show that the original assessment was incorrect, and that the listed property has been undervalued. See *In Re Daniel's Omitted Property*, 108 Okla 195, 235 P 543; *Commonwealth v. Kentucky Heating Co.*, 180 Ky 607, 203 SW 538; *White R. Lbr. Co. v. State*, 175 Ark 956, 2 SW2d 25 (Affirmed 279 US 692, 73 L ed 903, 49 S Ct 457).

And in this proceeding, which is a direct review of the action of the taxing authorities, the same ultimate burden of proof exists, even though "the findings and order of the commission shall carry a prima facie presumption of validity" (ORS 306.555).

When the findings of the county officers, and then of the Tax Commission, are predicated upon a particular theory or method of determining value, and it appears that this method is faulty, the effect is that the taxing authorities have failed to overcome the presumption in favor of the original assessment. The burden then remains on the taxing authorities to establish the undervaluation by proving "true cash value."

As applied to this case, the commission contends that when petitioner's factory cost was introduced, that was sufficient to make a prima facie case in favor of the additional assessment, thus shifting the burden to petitioner to show the true cash value of the inventories. And in the absence of a further showing of actual value, the commission contends that the additional assessment must stand. On the other hand, petitioner contends that when it showed substantial obsolescence, which was not reflected in factory cost, that was sufficient to invalidate factory cost as a sole

measure of value; and that the burden remained on the county to prove actual value, failing which the additional assessment must fall.

The trial court, in his memorandum opinion, stated that "Book value, while undoubtedly evidence of 'true cash value,' would only on perhaps rare occasions accurately reflect true cash value * * *."

■ We are unable to say, as a matter of law, with what rate of frequency book value might happen to coincide with true cash value. But we are convinced that a manufacturer's factory cost, when applied to an entire inventory, some items of which have been unsalable for many years, does not necessarily reflect true cash value. We agree that such cost may be evidence of value, but we cannot approve it as the sole measure of value in the face of substantial evidence of obsolescence.

True cash value was defined by the statute in effect at the time involved in this case, as "the amount such property would sell for at a voluntary sale made in the ordinary course of business, taking into consideration its earning power and usefulness under normal conditions" (ch 440, Oregon Laws 1941). The discussion of that definition in *Appeal of Kliks*, supra, although directed in that case to real property, is largely applicable to personal property also. We believe the statutory definition requires that consideration be given to obsolescence.

The commission advises us that its theory in this type of case was first disclosed in its opinion and order No. AT-54-31, In the Matter of the Appeal of Hyster Company, rendered in June, 1954. From that opinion we quote:

"It is the Commission's view that book value of inventory is the most nearly objective standard of

value available and its use is the only feasible procedure to measure the true cash value of inventory, provided that the book value is computed by use of the cost or market price of the inventory property, whichever is lower, or an equivalent pricing formula which properly recognizes obsolescence. In such case, the value so arrived at approximates the true cash value of such property."

From this it will be seen that the commission itself recognizes that a satisfactory method of valuation must make allowance for obsolescence. In this case the evidence is undisputed that the factory cost figures did not make any allowance for obsolescence of items on hand, although the branch inventories were reduced each year by the items actually scrapped or returned. Under the evidence, therefore, factory cost was not a fair measure of true cash value.

The commission cites the following four cases, none of which is very closely in point. In *Appeal of Sears, Roebuck & Co.,* 74 Idaho 39, 256 P2d 526, it was held that the taxpayer's cost, on the open wholesale market, was prima facie evidence of the value of a merchandise inventory, and when the assessor ignored those figures and made his assessment solely by comparing the square feet of floor space occupied by the taxpayer with that occupied by other mercantile establishments, the assessment was reduced by the court to correspond with the cost figures. No question of obsolescence was involved, the merchandise was apparently of a current nature, and the cost figures were not prior production costs, but what it would cost the taxpayer to replace the goods in the open market.

In *Anderson's Red & White Store v. Kootenai County,* 70 Idaho 260, 215 P2d 815, the issue was alleged lack of uniformity. The taxpayers claimed that

their stocks of merchandise were assessed at 20 per cent of actual cash value and that all other property in the county was assessed at 10 per cent of actual cash value. The trial court had not determined upon what relative basis property other than merchandise was assessed (a finding which was essential to decision of the question of discrimination) and the case was therefore remanded for such a finding.

In *Hillsborough County v. Knight & Wall Co.*, 153 Fla 346, 14 So2d 703, the foundation for assessing a merchandise inventory (with an average turnover of three times yearly) was an appraisal of each item at the lower of cost or market price. And when original cost differed from replacement cost, the lower of those was used. The controversy was over whether the appraised value should be reduced to allow for obsolescence by 50 per cent as claimed by the taxpayer or 20 per cent as allowed by the assessor. The taxpayer's evidence, which related largely to sales prices on liquidation of similar businesses and estimates of the sale price of the taxpayer's inventory if sold in bulk, was held insufficient to overcome the assessment. In that case, unlike this one, the assessor's method did allow for obsolescence.

In *State ex rel. Beloit Iron Works v. Beloit*, 257 Wis 422, 43 NW2d 473, the controversy was not over valuation, but as to the actual quantity of goods on hand. The taxpayer in reporting the inventory on hand at the factory, had deducted from the total inventory certain shipments made by subcontractors directly to customers and certain partial shipments from the factory to customers on uncompleted orders. The assessor had disregarded the taxpayer's figures and arbitrarily took a larger figure, because the taxpayer's figure "looked so ridiculously low." The court held that the

actual figures must control, and it set aside the additional assessment.

It will be noted that in the Sears, Roebuck case and in the Beloit case, supra, the assessments were set aside because the taxpayer showed that the assessor's method or basis for making the assessment involved a fundamental error. And in the Anderson case, supra, while the decision was to remand the case for further findings, the court said:

> "The county rested its case without offering any evidence. It is not intended to infer that the county had the burden of sustaining the assessments. On the contrary, the above stated presumption is valid and is to be liberally applied. [The presumption that the assessor and board of equalization performed their duties according to law.] We also adhere to the rule that evidence to overcome the presumptions must be clear and convincing. In re Winton Lumber Co., 53 Idaho 539, 26 P.2d 124; Colorado Tax Commission v. Midland Terminal Railway Co., 93 Colo. 108, 24 P.2d 745; Ozette Railway Co. v. Grays Harbor County, 16 Wash.2d 459, 133 P.2d 983. But when prima facie case of discrimination is established, then the assessments must be supported."

To that extent, the cases cited by the commission support our view with respect to the burden of proof. We conclude that when the county (and thereafter the commission) chose to rely exclusively on petitioner's factory cost, and petitioner showed that its factory cost did not make proper allowance for obsolescence, the taxing authorities failed to overcome the presumption in favor of the original assessment. In the absence of satisfactory proof of an undervaluation, the original assessment must stand.

It follows that the judgment setting aside the increased assessment and directing refund of the taxes paid under protest must be affirmed.

## 5. *Interest on the Refund*

 In the absence of specific statutory provision, the authorities are divided as to whether interest is allowable on tax refunds. Many cases are collected in annotations in 57 ALR 357, 76 ALR 1012, and 112 ALR 1183. The editors of those annotations state that the weight of authority favors the allowance of interest, although the contrary view has been asserted somewhat more frequently in recent cases.

The commission argues that when the statutes expressly provide for interest on refunds of certain taxes (e.g., ORS 306.300, 315.615, 316.615, 317.415), the absence of such a provision in the statute here involved (ORS 311.210) shows that the legislature intended to deny interest in this case. It also contends that the general statute providing for interest (ORS 82.010) does not apply to the state or a county in the absence of express mention. *Seton v. Hoyt,* 34 Or 266, 273, 55 P 967, 43 LRA 634.

Petitioner contends that where a tax refund is due, the state is in default from the time that demand for repayment has been made; and that the policy of the state, as expressed in the statutes first cited in the foregoing paragraph, is for the payment of interest from the time the state is in default. It is said to be only equity that if the state demands interest on the tax if not paid, then it should pay interest on the refund if the tax was not due.

Both parties assume that no statute specifically deals with the situation in this case, and neither party

has referred to ORS 306.260, which provides as follows:

> "Whenever it appears to the State Tax Commission from the audit of the returns required by any revenue measure, or otherwise, that the taxes, penalty or interest paid by a taxpayer or any part thereof, are in excess of those due or legally assessable, the commission is hereby authorized to refund to any taxpayer who has paid the tax, all taxes, interest or penalties in excess of those due or legally assessable, *with interest at the rate of six percent a year from and after 30 days from the date of filing claim for refund.*" (Italics ours.)

While this statute is phrased as an authorization, rather than a mandate, and it deals with refunds directly from the commission, rather than the county, we believe it expresses the public policy of the state that interest is allowable on tax refunds generally. At least it is a sufficient mention of the state to take the case out of the rule of *Seton v. Hoyt,* supra, and render applicable the general statute providing for interest on "all moneys after they become due" (ORS 82.010).

The record does not show the form of the payment under protest, but we assume that it was the equivalent of a claim for refund, and we hold that interest is due from and after thirty days from the date of the payment under protest.

The judgment is affirmed.