Argued May 5, affirmed July 26, petition for rehearing
denied September 5, 1961

# GEORGIA-PACIFIC CORPORATION *v.* STATE TAX COMMISSION

363 P. 2d 1104

*Norman J. Wiener,* Portland, argued the cause for appellants. With him on the briefs were King, Miller, Anderson, Nash & Yerke, Jean Lowman, and John B. Crowell, Jr., all of Portland.

*Richard Rink,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Robert Y. Thornton, Attorney General, Salem.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Goodwin, Justices.

PERRY, J.

We have carefully examined the record in this case and after full consideration, being of the opinion that the following written opinion of the trial court fully expresses our views, it is adopted as the opinion of this court:

"The Petitioners, Georgia-Pacific Corporation, and its subsidiary, Coos Bay Timber Co., a corporation, were the owners of a sawmill and planing mill and a hardboard manufacturing plant in Bunker Hill, a sawmill in Millington, and a plywood plant and related facilities in Coquille, all in Coos County, Oregon, together with a timber supply to furnish said plants.

"The above mills and plants and timber were purchased from the Coos Bay Lumber Company, a corporation, on July 10, 1956, and have since been operated by the petitioners more or less in conjunction with each other. This was particularly true of the sawmills in Bunker Hill and Millington.

"During the year 1955 appraisals were made of these properties by appraisers of the State Tax Commission for the benefit of Coos County. The Chief Appraiser was Mr. Schuh who had had several years experience appraising industrial properties for the Tax Commission. Mr. Schuh did all, or practically all, of the appraising of the machinery and equipment in

the subject plants. Mr. Ensign, who was comparatively new with the Commission as an appraiser, did the principal part of the appraising of the buildings involved. However, he worked directly and constantly under the advice and supervision of Mr. Schuh, and all his appraisal work was checked and approved by Mr. Schuh.

"The above mentioned properties were assessed by tax lot numbers and approximately 15 appeals taken thereon from the assessment by the assessor for the years 1957 and 1958 to the Board of Equalization of Coos County, which Board denied said appeals.

"Appeal was then taken from the Board of Equalization rulings to the State Tax Commission. The appeal to this Court is from the ruling of the State Tax Commission, which lowered the overall assessments against the petitioners on the properties involved.

"Before the Tax Commission and before this Court, the contested assessments were grouped as follows, and without reference to particular tax lot numbers:

"For the year 1957

"COQUILLE, OREGON
    Machinery and equipment
    Buildings and improvements.

MILLINGTON, OREGON
    Machinery and equipment only.

BUNKER HILL, OREGON
    Sawmill
        Machinery and equipment
        Buildings and improvements
    Hardboard plant
        Machinery and equipment
        Buildings and improvements.

"For the year 1958 these same assessments were contested as for the year 1957 and with the addition for the year 1958 of buildings and improvements at Millington.

"The Hearings Officer for the State Tax Commission took several hundred pages of testimony in the matter and some 49 exhibits were introduced, many of them quite voluminous, consisting of the work sheets, reports, etc., of the various appraisers.

"The entire record made before the Hearings Officer was submitted to this Court together with briefs and oral arguments, but without any further testimony.

"The Tax Commission by Opinion and Order No. VL 59-594, as above mentioned, lowered the overall assessment of the Petitioners for both years 1957 and 1958. They did increase particular parts of the 1957 assessment to conform generally to the appraisals as made by their appraisers in 1955, after making use of their depreciation and trending factors. They agreed with the Petitioners that assessor's figures for 1957 did not reflect 'true cash value.'

"The petitioners by their petition and brief set out the primary issue as follows:

'Did the appraisals made by the administrative staff of the Commission in 1955, as brought up to date by the formula used by such staff, correctly arrive at the market value of the properties in question as of January 1, 1957 and January 1, 1958?'

"They then set out in the brief ten (10) issues designated 'corollary issues' which will not be set forth verbatim herein.

"The same matters stated in somewhat different language are contained in Petitioner's petition under 'Grounds for Petitioner's Contentions, Par. XVII.'

"They then make two contentions under Par. XVIII and XIX, which they designate jurisdictional issues in their brief. XVIII alleges in effect that the Commission had no legal right or authority to raise the assessed valuations of the machinery and equipment of the Coquille plant for the year 1957.

"Par. XIX alleges in effect that the Hearing Officer failed to make findings and conclusions as provided in ORS 306.535(1).

■ "Taking up this first jurisdictional question first, it is clear that the Petitioners must fail on that particular issue. They offered no proof whatever to substantiate such a claim. The order VL 59-594, attached to the petition itself on the first page thereof shows that such findings and conclusions were prepared and reviewed by the entire Commission. There was no duty on the Commission to introduce such findings in this Court. The presumption is in favor of their order, including that part mentioning the findings. Nothing has been offered to overcome that presumption or to prove the above claim of the Petitioners that no findings were made.

"Before taking up Petitioner's 'Primary issue', it is well to note that so far as the year 1957 was concerned, the real issue before the Tax Commission was whether or not the Assessor's assessment for that year was arrived at in the proper manner and whether it properly showed 'market value', 'true cash value' and 'assessed value.' The Commission found that it did not. I agree with their finding in that regard.

"At best, it could be called a 'historical' value that had been carried for many years with some variations. It was founded to some extent at least on the values submitted by the owners or their predecessors, and

carried on some kind of a verbal agreement, or at least acquiescence, by the taxpayers.

"In fairness to the Assessor, it must be remembered that he did not have sufficient or suitable personnel to make a real appraisement and was attempting to do his best under the conditions. He apparently did not have the 1955 appraisal at the time of the January 1, 1957 assessment. Just why is not clear. But at least he did not use it until January 1, 1958.

"Chapter 306 ORS and following chapters give the State Tax Commission general supervisory power over the administration of assessment and tax laws and general supervision and control over the County Assessors and County Board of Equalization, with the general idea of seeing that all property is assessed and taxed according to law, to see that there is uniformity in assessments and equality of taxation.

"In order to better secure this uniformity and equality, the law has wisely given the State Tax Commission the power to make and publish rules and regulations to effectively carry out the purposes for which it is constituted. Of course those rules and regulations must be in conformance with other laws.

"There seems to be substantial agreement between the Petitioners and the Commission on the definition of 'market value' as generally used, both in tax and in condemnation cases.

" 'Market value' is the amount which property will bring if it was offered for sale by one who desired but was not obliged to sell, and was bought by one who was willing but not obliged to buy. This is substantially as set forth in *State Highway Commission v. Superbilt Manufacturing Co.*, 204 Or 393, 281 P2d 707.

" 'True cash value' is often used interchangeably with 'market value' and sometimes causes confusion as

they might be the same or might vary. *Appeal of Kliks*, 158 Or 669, 689, 76 P2d 974.

" 'True cash value' as defined by ORS 308.205(1)— means the amount the property would sell for at a voluntary sale made in the ordinary course of business, under normal conditions, in accordance with rules and regulations promulgated by the State Tax Commission.

"The State Tax Commission has determined that a normal conditions factor of 80% of the market value for the year 1957 and 90% for the year 1958 should be used to determine the 'true cash value.' The posted ratio for determining assessed value in Coos County for the years 1957 and 1958 was 23% of the true cash value.

"The above percentages were used by both the Petitioners and the Commission to get from 'market value' to 'true cash value' and on to the "Assessed Value."

"The real crux of the Petitioner's Complaints, aside from the jurisdictional questions, seems to be the manner used by the Commission's appraisers in arriving at 'Market Values' and the amounts of 'Market Values' they arrived at.

"The Commission by its regulations has set out the tests to be used to approximate market value when a market actually exists, and if a market is nonexistent these techniques will approximate the value to the owner. They are:

"The Cost approach method or summation method.

"The Income Approach or income capitalization method.

"The Market Data approach or comparative method.

"Without quoting from the regulations, they then go into some detail, explaining the different methods, particularly as to structural improvements under the cost approach method.

"In the regulations, they describe how to arrive at replacement cost of equivalent utility; depreciation, both by deterioration and obsolescence. Obsolescence includes either functional or economic causes. They then provide the two acceptable methods of estimating depreciation (which includes obsolescence by functional or economic causes), namely: observed condition and age-life methods.

"In this case the Petitioners called the Commission's appraisers, Mr. Schuh and Mr. Ensign, as well as the County Assessor as their own witnesses and examined, and really cross-examined, them in minute detail as to each item of property appraised.

"While some answers were made to questions by Petitioner's counsel that would indicate that the Commission's appraisers merely got the reproduction cost of various parts less physical depreciation and added them up as a total to get the entire appraisal, a careful reading of the transcript of all their testimony gives a far different impression of their testimony.

"It is clear from the testimony of Mr. Schuh, and the other witnesses, that they were unable to find comparable sales of going concerns in order to reach the market data approach. Most sales of any kind were for salvage or liquidation, or were interwoven with vast timber stands and other properties, as the petitioner's purchase of this property was, and the sale or purchase price was not available to the Commission's appraisers.

"Likewise they were unable to reach the market value from the income approach, as that material was

available only to the Petitioners, if they could segregate it themselves.

"This Court finds that the Commission's appraisers made a fair and thorough appraisal of the properties and used the best method available to them to arrive at their market values.

"The Petitioners offered three appraisers in addition to the Commission's appraisers. One of them testified to strictly salvage value, for all the plants, stating that in his opinion their market value was synonymous with their salvage value. This method was an improper way to evaluate a going plant.

"Another of Petitioner's appraisers, Mr. Thompson, a man of considerable experience in the timber industry, gave his opinion of market values, and exactly the same values as the Petitioners use in their petition, based primarily on his years of experience. He gave very few specific reasons for his figures. He did state that the big sawmill at Bunker Hill had a market value for salvage value only. This, in spite of the fact that at the trial and for many years prior thereto and thereafter, that mill was in continuous operation on at least a two shift a day basis. He apparently ignored the fact that hundreds of thousands of dollars in new equipment and modernization had been placed in the mill.

"It is noticeable that this witness values the Bunker Hill Sawmill machinery and equipment at only $431,600.00 for 1957, even less than Mr. Carroll had testified it was worth for salvage.

"The Petitioner's next appraiser, Mr. Stewart, gave a set of values which totaled quite close to Mr. Thompson's overall appraisal, but he used many factors which this Court feels should not be used in determining market value under our tax laws and regulations.

"It is noticeable that in his appraisal of the buildings at the Millington mill he gave there a value of $4,000.00 for 1958. Even the Petitioners themselves on Page 7 of their petition set their value at $181,000.00. The evidence shows them to be large truss type, newly constructed buildings, and well maintained. There were serious defects in all the Petitioner's appraisals.

■ "Considering all the evidence in the case, I am of the opinion that the Petitioners have failed to show that the values set forth in Tax Commissioner's Order No. VL 59-594 are not the proper 'market values,' the 'true cash values' and 'assessed values.'

■ "As to Petitioner's first jurisdictional claim that the Tax Commission could not raise any part of the assessment, I am of the opinion that they do have that power and that it was their duty to do so. Both parties claim and offered proof that the valuation of the Assessor for 1957 did not show 'true cash value' and did not show proper 'assessed values.' They were set aside on Petitioner's own request. It then certainly becomes necessary for the Tax Commission to determine the 'true cash values' and the proper 'assessed values' for that year. This they did from the evidence before them, which was practically all put in by the Petitioners. They would not be bound to pass on merely evidence that showed less values than the Assessor had used.

"The State Tax Commission could not change assessments on any of Petitioner's property not covered by this appeal. Such is the holding in the cases cited by the Petitioners, to-wit: *State v. Jemez Land Co.,* (N.M.) 226 P 890; *City of Newark v. Timer,* (N.J.) 170 A 37; *Robinson v. State Tax Commission,* 216 Or 532, 339 P2d 432.

122

". "No cases have been cited that hold that the State Tax Commission or the Court cannot determine from the evidence 'true cash value' of the particular property, or part thereof covered by the appeal, after the Assessor's 'true cash value' is determined to be wrong, even though the determined 'true cash value' exceeds the value appealed from as to one or more particular items. The Commission's duty is to find 'true cash value' as well as uniformity and equality in taxation.

"In any event, attorneys for both sides seem to agree and the law provides that the Court shall determine the 'true cash value' and 'assessed value,' and I so find and determine that the values arrived at and set by the Commission in Order No. VL 59-594 are the proper values, and are adopted as the court's values herein. *Case v. Chambers et al.*, 210 Or 680, 696, 314 P2d 256."

The decree of the trial court is affirmed.

Neither party shall recover costs in this court.