# SPROUL *v.* STATE TAX COMMISSION

36

James R. Moore and Bruce Spaulding, Portland, tried the case for plaintiff. On the brief were Mautz, Souther, Spaulding, Kinsey & Williamson and James R. Moore, all of Portland.

Donald H. Burnett, Assistant Attorney General, Salem, tried the case for defendant. On the brief were Donald H. Burnett, Assistant Attorney General, Salem, and Carlisle B. Roberts, Assistant Attorney General, Salem.

Decision for plaintiff rendered August 31, 1962.

PETER M. GUNNAR, Judge.

This is a suit to set aside a deficiency assessment of additional income taxes for the calendar year 1958. Upon a formal hearing, the State Tax Commission

confirmed the additional assessment by its opinion and order No. I-62-6 and, thereupon, the plaintiff brought this suit.

In 1958, plaintiff Robert Sproul, a cattle rancher, was charged with the murder of Harlan Williams in Grant County, Oregon. Upon a trial being had in the Circuit Court for Grant County, Robert Sproul was acquitted. During 1958, Robert Sproul paid $22,864.31 in attorneys' fees and expenses in connection with his defense against the murder charge. The plaintiffs deducted that sum as business expense on their joint state income tax return for 1958. The defendant denied the deduction, and assessed a deficiency. It is this deficiency which is in controversy here.

The applicable statute, ORS 316.305(1), which in its important elements is identical to the federal statute, provides in its applicable parts:

"316.305. Expenses. In computing net income there shall be allowed as deductions:

"(1) All ordinary and necessary expenses, paid during the tax year in carrying on any trade or business, including:

"(a) A reasonable allowance for salaries or other compensation for personal services actually rendered; * * *."

The crucial statutory language is "ordinary and necessary expenses," and the basic question which this court must decide is: Was the litigation expense an ordinary and necessary expense of Sproul's business?

Under the rules of this court, the parties stipulated that Sproul was acquitted and that he was acting in the course of his business as a rancher and land owner at the time of the shooting. The taxpayers contend that, since the shooting is conceded to have taken

place while Sproul was engaged in an activity connected with his business, the expense is deductible because it is ordinary and necessary for a person to hire an attorney to defend him from a criminal charge arising from that activity.

The commission seeks to go more deeply into the act itself. It concedes that hiring an attorney to defend a criminal charge is an ordinary and necessary act, but it claims the expense is not deductible because Sproul did not act as a reasonably prudent man would have in the circumstances, because the activity leading to the shooting was not ordinary and necessary, because the shooting was provoked out of personal motives on both sides, and because the existence of another road as an alternative route to that in dispute removed the business necessity of forcing the issue to the point of shooting.

Finally, if the expense is a business expense, the commission contends that it is a capital expense and should be added to the asset basis and depreciated or amortized, rather than be allowed as an ordinary business deduction.

## REGULATION

The defendant's own regulation 6.305(1)(a)-(D), interpreting ORS 316.305, reads in part:

> "Legal expenses in defense of criminal charges are deductible if the alleged acts for which the charge is made were committed in the performance of duties connected with a public office, employment, trade or business which is not unlawful in itself and if the taxpayer is acquitted. If the taxpayer is found guilty, the deduction is disallowed because an illegal act is against public policy and is not an ordinary and necessary business adjunct."

In denying the plaintiffs' deduction, the commission is ignoring the plain meaning of its regulation requiring that only two conditions be met to justify the deduction. Instead it seeks to require a further condition, one of reasonableness of conduct, as necessary to establish the deduction. If the commission regulations had the force of law, this regulation would determine this case in the plaintiffs' favor.

██ However, as the commission recognizes by adding this new condition in its opinion and order, its regulations are highly persuasive but not controlling. *Keyes v. Chambers,* 209 Or 640, 661, 307 P2d 498 (1957). It is still the court's responsibility to construe the statute and apply its construction to the facts before it.

## FEDERAL LAW

██ There are no cases in Oregon construing our statute with reference to criminal defense costs. In this circumstance, since the federal statute uses the identical words, "ordinary and necessary," in the same connotation used in ORS 316.305, the federal courts' interpretations of this language are of substantial persuasion. *Pacific Supply Cooperative v. State Tax Commission,* 224 Or 556, 560, 356 P2d 939 (1960).

 The U. S. Supreme Court decisions, starting with *Kornhauser v. U. S.,* 276 US 145, 48 S Ct 219, 6 AFTR 7358 (1928), lay down the broad outlines of the law in this area. In *Commissioner v. Heininger,* 320 US 467, 64 S Ct 249, 252-3, 31 AFTR 783, 786-7 (1943), in which the court allowed the deduction for the costs of an unsuccessful defense of a civil action for mail fraud, Mr. Justice Black stated the rule as follows:

"[2] It is plain that respondent's legal expenses

were both 'ordinary and necessary' if those words be given *their commonly accepted meaning.* For respondent to employ a lawyer to defend his business from threatened destruction was *'normal'*; it was the response *ordinarily to be expected.* Cf. Deputy v. Du Pont, 308 U.S. 488, 495, 60 S. Ct. 363, 467, 84 L.Ed. 416; Welch v. Helvering, 290 U.S. 111, 114, 54 S.Ct. 8, 9, 78 L.Ed. 212; Kornhauser v. United States, supra. Since the record contains no suggestion that the defense was in bad faith or that the attorney's fees were unreasonable, the expenses incurred in defending the business can also be assumed *appropriate and helpful,* and therefore *'necessary.'* Cf. Welch v. Helvering, supra, 290 U.S. at page 113, 54 S.Ct. at page 8, 78 L.Ed. 212; Kornhauser v. United States, supra, 276 U.S. at page 152, 48 S.Ct. at page 220, 72 L.Ed. 505. The government does not deny that the litigation expenses would have been ordinary and necessary had the proceeding failed to convince the Postmaster General that respondent's representations were fraudulent. Its argument is that dentists in the mail order business do not ordinarily and necessarily attempt to sell false teeth by fraudulent representations as to their quality; that respondent was found by the Postmaster General to have attempted to sell his products in this manner; and that therefore the litigation expenses, which he would not have incurred but for this attempt, cannot themselves be deemed ordinary and necessary. We think that this reasoning, though plausible, is unsound in that it fails to take into account the circumstances under which respondent incurred the litigation expenses. Cf. Welch v. Helvering, supra, 290 U.S. at pages 113, 114, 54 S.Ct. at pages 8, 9, 78 L.Ed. 212. Upon being served with notice of the proposed fraud order respondent was confronted with a new business problem which involved far more than the right to continue using his old advertisements. He was placed in a position in which not only his selling methods but also the continued

existence of his lawful business were threatened with complete destruction. So far as appears from the record respondent did not believe, nor under our system of jurisprudence was he bound to believe, that a fraud order destroying his business was justified by the facts or the law. Therefore he did not voluntarily abandon the business but defended it by all available legal means. To say that this course of conduct and the expenses which it involved were extraordinary or unnecessary would be to ignore *the ways of conduct and the forms of speech prevailing in the business world.* * * *" (Emphasis supplied.)

In these Supreme Court decisions, it is implied that deductible expenses, to be "ordinary and necessary", must merely be "reasonable in amount and must bear a reasonable and proximate relation to the" business. If they do not have this relation, they are personal expenses and not deductible. *Lykes v. United States,* 343 US 118, 72 S Ct 585, 41 AFTR 606 (1952). "Ordinarily questions of reasonableness and proximity are for the trier of fact, * * *." *Bingham's Trust v. Commissioner,* 325 US 365, 65 S Ct 1232, 1235, 33 AFTR 842, 845 (1945).

■ All these Supreme Court cases deal with civil litigation, but in the *Heininger* case, *supra,* the court appeared to confirm the public policy rationale used by the Tax Court and other federal courts in all criminal cases to deny the deduction when the taxpayer is convicted of a crime. The deduction of litigation expenses in criminal cases is denied when its allowance would "frustrate sharply defined national or state policies prescribing particular types of conduct." The courts and the Oregon regulation have deemed conviction of the crime sufficient frustration and have inter-

preted the *Heininger* case, *supra,* as authority for this position. *Thomas A. Joseph,* 26 TC 562 (1956). While there is some logical basis for holding otherwise (See: Valentine Brookes, "Litigation Expense and the Income Tax," 12 Tax L Rev 241), the instant case is one of acquittal, making this point moot here.

■ However, in the federal courts, contrary to the Oregon regulation quoted above, the converse proposition, that acquittal justifies the deduction, is not necessarily the rule. The federal decisions concerning litigation expenses in criminal cases resulting in acquittal do not uniformly allow the deduction, even though a business connection is shown, nor do they establish clearly any additional qualification for the deduction in acquittal cases. Acquittal is an absolute necessity in the federal cases but it alone is not sufficient. In the only case involving a homicide, *B. W. Sturdivant,* 15 TC 880 (1950), the deduction was denied because the court found a personal, as well as business, motivation in the acts leading to the death. This case is confused by the additional element that the business entity claiming the deduction was a partnership.

■ The existence of additional qualifications for the deduction is apparent, but its essence goes undefined, in two morals cases in which the deduction was allowed in one case and denied in the other. In *John W. Clark,* 30 TC 1330 (1958), deductions of not only criminal defense fees in a case of assault with intent to rape, but also fees for civil advice and the amount of an out-of-court, civil settlement, were allowed, apparently because the taxpayer was engaged in a routine activity which he followed in all similar situations. On the other hand, in *Charles M. Grace,* 7 P-H BTA Memo 750, sec 38,451 (1938), the court disallowed a deduc-

tion for the costs of a successful Mann Act defense on behalf of a minister who transported a female church member across state lines to a church meeting, the court finding that the expense was personal rather than business connected. While the Tax Court apparently found a distinction of substance between these two cases, this distinction defies exact expression, unless it is based upon the regularity, the "ordinary" character, or in the language of the defendant's brief, the "everydayness," not of the expense itself but of the taxpayer's conduct leading up to the criminal charge. To say the least, this is a substantial departure from the language and spirit of *Commissioner v. Heininger, supra,* and clear justification for the questions noted above (12 Tax L Rev 241).

In the instant case the State Tax Commission not only seeks to follow these Tax Court decisions, but it seeks to attach its own embroidery to them. Besides the requirement of "ordinary" character of the taxpayer's conduct, it seeks to read into "ordinary and necessary" a requirement that, in the activity which led to the criminal charge, the taxpayer must meet the tort doctrine of a "reasonably prudent man" in order to establish it as "necessary." Without deciding whether this tort doctrine applies, it must be said that, to apply at all, it must be associated with the circumstances of the case. In other words, no more could be required of the taxpayer than that he acted as a reasonably prudent man in like circumstances in Grant County in 1958 would have acted.

In any event, regardless of whether the expense must bear merely a "reasonable and proximate relation" to the business, or the taxpayer's conduct leading to the criminal charge must be regular or of an

ordinary character, or the taxpayer's conduct leading to the charge must be necessary by conforming to that of a reasonably prudent man in the circumstances, or whether all three standards apply, the ultimate question of "ordinary and necessary expense" is one resting upon the facts of each case and is one of fact for the trier of fact, or at least a mixed one of fact and law. *Bingham's Trust v. Commissioner, supra.* Acknowledging that the road in dispute between Sproul and the decedent, Williams, and its use, was involved in Sproul's business, the commission nonetheless felt that the shooting occurred in part because of bad personal feeling between Sproul and Williams. If, in fact, such feeling existed and whether its existence and its magnitude were sufficient to affect the deduction which Sproul claimed is a mixed question of law and fact. Thus, again it is a mixed question of law and fact whether the alternative road was adequate, whether its existence destroyed the business connection with the shooting, and whether Sproul was required to refrain from direct self-help because of it. Finally, the commission questions the deductibility of the defense costs of any crime of violence as a matter both of policy (law) and of reality (fact). On the other hand, Sproul takes the position that if he was acquitted of a crime which arose in connection with his business, the defense costs are deductible. Thus, in deciding this case the court is required to reach factual conclusions from the evidence adduced at the trial and then determine the law applicable to them.

█ In determining the facts in any law suit, certain rules of evidence and procedure must be applied in weighing the adduced evidence. In most cases these rules are so firmly established and defined that they

are silently assumed in any judicial opinion. Unfortunately, in the tax field they are neither firmly established nor well defined. For example, whether the burden is met in income tax cases by a preponderance of evidence or requires the "clear and convincing preponderance of the evidence" (*Consolidated Freightways, Inc. v. State Tax Commission,* 74 Adv Sh 381, 384, 370 P2d 224 (1962)) or "clear and cogent evidence" (*A. C. Dutton Lbr. Co. v. State Tax Commission,* 228 Or 525, 531, 365 P2d 867 (1961)), required in allocation cases, or "clear and convincing evidence" (*Appeal of Kliks,* 158 Or 669, 688, 76 P2d 974 (1938)), required under earlier property tax statutes, has never been decided in Oregon. Neither has it been decided whether the presumption of assessment validity attaches to the assessment of additional taxes, as it does to the assessor's property tax assessment, and if it does, whether it attaches to the auditor's assessment or to the finding of the State Tax Commission upon appeal.

Because these issues have not been decided, and because, with equal pertinence, the procedure under the Oregon Tax Court Act (Oregon Laws 1961, ch 533) differs in both language and intent from previous procedures for judicial review of tax cases, the questions of presumptions, burden of proof, and quantum of proof must be answered before any intelligent factual analysis can be made.

This unfortunate lack of established and well defined principles in the tax field arises, in part, from a confusion of the proper offices of presumptions, quantum of proof, and burden of proof. Too frequently courts have sought to combine these concepts in a single measure when clarity of the function and

the force of these concepts can only be maintained by preserving the separateness of their nature. In this opinion, each will be discussed separately first and then the effect of their combination will be explored. The conclusions reached here are limited to this type of case—an income tax abatement case before the Oregon Tax Court.

## BURDEN OF PROOF

Turning first to the burden of proof, the easiest and least complicated of these concepts, it is clear that the burden in income tax cases is on the taxpayer. *Inland Navigation Co. v. Chambers,* 202 Or 339, 361, 274 P2d 104 (1954). ORS 41.210 provides:

> "41.210. The party having the affirmative of the issue shall produce the evidence to prove it. Therefore, the burden of proof lies on the party who would be defeated if no evidence were given on either side."

Since the statute gives an assessment of additional income taxes the practical force of a judgment (ORS 314.430(2)), the taxpayer would be defeated if no evidence were introduced, if the parties were left where they were. It is the burden of the taxpayer to justify the removal of that judgment-like assessment.

## PRESUMPTIONS

There is no doubt that the common presumptions of evidence set forth in ORS 41.360 apply to tax cases with equal force as they do in all litigation in Oregon. *Georgia-Pacific Corporation v. State Tax Commission,* 228 Or 112, 116, 363 P2d 1104 (1961). These presumptions create no difficulty in tax cases. The difficult presumption, some-

times called the presumptions of assessment validity, is that the assessment determination of the proper taxing authority is presumed to be valid. This presumption is discussed and supported in numerous property tax cases in Oregon. *Appeal of Kliks, supra.* Though it often is confused with the presumptions set forth in the statute, not a single Oregon decision mentioning this presumption refers to the statute for authority. It is court created, not statutory, and is clearly distinguishable from the statutory presumption of "official rectitude." ORS 41.360(15). At one time this presumption as to property tax appeals was statutory (Oregon Laws 1953, ch 708) but it never has been a part of the income tax statutes. The statutory language of the presumption of official rectitude is far more limited in scope and presumes the performance of formal, official acts in a regular or proper manner, not the accuracy of the official in matters of judgment. For example, the following of proper procedure by the State Tax Commission in hearing a tax appeal will be presumed under ORS 41.360(15). *Georgia-Pacific Corporation v. State Tax Commission, supra.* This does not mean that its decision is presumed correct, but only that it followed the proper procedural steps in arriving at its decision. The accruacy of its decision will be presumed, if at all, under the judicially established presumption of assessment validity. This latter presumption presumes that the determination of the commission is substantively correct, as opposed to procedurally correct, and as in the case of the procedural presumption, this substantive presumption clearly is disputable.

■ One of the questions before the court in this case is whether the presumption of assessment validity

applies to income tax cases, as it so clearly and force-fully has been applied by the courts heretofore in property tax cases. *Appeal of Kliks, supra.*

## Applicability

The rule of presumptive validity of a tax assessment is based first upon the inherent attribute of sovereignty to collect revenue and the quasi-judicial nature of the determination of tax liability by the sovereign. *Knappton Towboat Co. v. Chambers,* 202 Or 618, 623, 276 P2d 425, 277 P2d 763 (1954); *Weyerhaeuser Land Co. v. Board,* 85 Or 434, 443, 165 P 1164 (1917); *Southern Oregon Co. v. Coos County,* 39 Or 185, 192, 64 P 646 (1901). In the words of Baron Clarke in *An Information Against Bates,* Lane's Reports 23, 145 English Reports (Exchequer) 267 (1606): "as it is not a kingdome without subjects, so he is not a King without revenues." This rule of sovereign power extends to all fields of taxation.

Secondly, as pointed out by Mr. Justice Rossman in a property tax case, *Appeal of Kliks, supra,* at page 687:

> "* * * since courts always presume, in the absence of evidence to the contrary, that official duty has been properly performed, the appealing taxpayer is met with a presumption of official rectitude. The latter is not a mere legally created makeweight, but is based upon the assessor's superior knowledge * * *."

Clearly the court was referring to the presumption of assessment validity, the substantive presumption, and was supporting this presumption by the technical nature of the field and the assumed greater familiarity

of the assessing official with the facts and the technical aspects of taxation. This concept of technical proficiency applies as cogently and forcefully in income tax cases as it does in the property tax cases.

▉▉▉ Thirdly, Oregon follows the federal tax procedures wherever this can be done without violence to the variations of the Oregon tax law from the federal tax law and without a loss of its sovereign independence. *Pacific Supply Cooperative v. State Tax Commission, supra; Ruth Realty Co. v. State Tax Commission,* 222 Or 290, 294, 353 P2d 524 (1960). The presumptive validity of the commissioner's income tax deficiency assessments is of long standing and almost could be assumed to be a concept adopted into Oregon law. *J. M. Perry & Co., Inc. v. Commissioner,* 120 F2d 123, 124, 27 AFTR 374 (1941); *Welch v. Helvering,* 290 US 111, 115, 54 S Ct 8, 78 L Ed 212, 12 AFTR 1456 (1933).

▉ Finally, there are "sound practical considerations" for the presumptive validity of assessments. As noted by Mr. Justice O'CONNELL, in *West House, Inc. v. State Tax Commission,* 228 Or 167, 178, 364 P2d 598 (1961):

> "* * * Some point must be set as a relatively final stage in the tax collection process so that the taxpayer can, with some degree of certainty, make the necessary calculations as to the cost of doing business. * * *"

This "sound practical" consideration applies equally to income and property tax cases.

▉▉▉ This court is not unmindful of the case which can be stated against this presumption. As noted above, rationale for the presumption is found in the

superior knowledge of the taxing agency. *Appeal of Kliks, supra.* This same justification is used to sustain like presumptions in favor of other administrative tribunals dealing in technical problems. *Dimitroff v. State Industrial Accident Commission,* 209 Or 316, 340, 306 P2d 398 (1957). It is not so clear but equally accurate that the property tax presumption arose in large measure out of the limited nature of judicial review heretofore afforded in Oregon and at times was based upon the express mandate of the statute. Oregon Laws 1953, ch 708; *Case v. Chambers,* 210 Or 680, 696, 314 P2d 256 (1957). These conditions have been changed by the Oregon Tax Court Act. By creating a court of justice intended to be expert in the tax field, the rationale of the presumption is affected. By earlier deleting the statutory presumption and then creating the expert court and destroying the *raison d'etre* of the presumption, it could be argued that the legislature intended to dispense with it. It could be further argued that the U. S. Tax Court rules do not apply because of the executive or administrative nature of that court and the substantial difference between the "pure" or Thayer-Wigmore presumption there applied and the evidentiary presumption in Oregon. Substantial support for these general arguments can be found among recognized authorities. Hellerstein, "Judicial Review of Property Tax Assessments," 14 Tax L Rev 327, March 1959. These arguments were well in mind when the Oregon Tax Court Act was drafted.

The intention of the legislature in the creation of this court that the taxpayer obtain here a wholly independent judicial review which more completely and exhaustively considers and decides the issues of taxation without fear or favor to either the

state or the citizen is fully and favorably understood by this court. But such review and determination does not warrant the destruction of a presumption, the genesis of which reaches into the haze surrounding the very beginnings of our legal system. See, 2 Madox, History of the Exchequer, 23-24; *An Information Against Bates, supra.* If, as discussed later, the presumption is kept separate from other concepts and fulfills its proper office, it has the salutary effect of preventing any unnecessary disruption of that revenue without which the state is not, and yet it neither defeats nor substantially hinders recovery by a citizen upon a just cause shown. It also serves the practical consideration noted by Mr. Justice O'CONNELL.

■ In the reasons set forth above, with due consideration of the contrary arguments, there appears ample justification for applying in the income tax field the presumption of assessment validity so long applied with varying effect and for varying reasons in the field of property taxation.

## When Presumption Attaches

■ Having decided that the presumption of assessment validity applies in income tax abatement cases, the next question is: When does the presumption attach? Here the distinctions between the income and property tax processes force a departure from the property tax rule that the presumption attaches to the assessor's determination.

By direct analogy with the property tax presumption, the point at which the income tax presumption attaches should be the issuance of the notice of tax deficiency. Both the notice of deficiency assessment

of the commission and the placing of the assessed value on the roll by the assessor create a liability which has the finality of a judgment. ORS 311.405; 314.430. However, three distinguishing features militate against the application of this direct analogy and the attaching of the presumptive validity to this notice. First, the county assessor is an independent taxing official whose assessment is judicial in nature, *Knappton Towboat Co. v. Chambers, supra; Weyerhaeuser Land Co. v. Board, etc., supra; Southern Oregon Co. v. Coos County, supra;* whereas the auditor or director of the income division of the tax commission, whose decision it is to levy the additional tax, is a subordinate official of an administrative agency. Albeit both exercise functions presumably judicial in nature, the auditor or income director does so as a subordinate delegate or agent. Secondly, while the State Tax Commission has reviewing authority over both determinations, it reviews the property assessment of the assessor and its equalization by the board of equalization, in part, as an independent, quasi-judicial tribunal (ORS 306.515), as well as a supervisory, administrative body (ORS 305.090, 306.111), whereas its review of its auditor's action is an administrative review of an action of its subordinate taken in its own name. Thirdly, the statutes make a clear distinction between the finality of the two assessments. In the property tax case, the assessment is so final that the collection of the tax is not stayed by an appeal to the courts. ORS 306.560. In the income tax case, the assessment and collection is stayed by an appeal, unless the commission believes the tax to be in jeopardy, and even then if the court so orders. ORS 314.465. This distinction imparts far greater finality to the property

tax assessment. These three distinctions point up the difference in the State Tax Commission's relationship to the assessment in the income and property fields. In the property tax field it is merely a quasi-judicial reviewing authority. In the income tax field it is the assessing authority itself.

These distinctions lead to the overwhelming reason for distinguishing between the points at which the presumptive validity attaches to these assessments. This reason is the impossible result which would obtain in the income tax field, were the presumption to attach to the notice of tax deficiency. This notice issues thirty days after the proposed notice of tax deficiency is sent out by the auditor, unless an informal conference is requested with the division director. If the conference is sought but is fruitless, the notice issues and the tax is assessed after the conference. If the presumption were to attach at this point, and then, after a hearing upon a formal appeal, the commission were to change the assessment, the commission would be faced in an appeal to the court with the presumption against it and in favor of a decision of its own subordinate. *West House, Inc. v. State Tax Commission, supra.*

■ Therefore, both the natural and statutory distinctions between the two assessments and the two administrative processes and the inherent logic of the situation require that the presumption of validity in income tax cases attach to the finding of the commission after its review upon appeal rather than to the original assessment notice.

*Effect of Presumption of Assessment Validity*

■■■ Logic having inexorably brought forth the application of the presumption of assessment valid-

ity and when it attaches, the next question concerns the presumption's effect. In federal tax cases and in the majority of state courts, the office of a presumption is to establish the burden of going forward with the proof and does not affect the burden of proof. This is the "pure" presumption of the Thayer-Wigmore concept. Once the burden of going forward with the proof is met in a federal tax case, the presumption disappears and it is as though the presumption never existed. 9 Mertens, Law of Federal Income Taxation 148, sec 50.71. On the other hand, a presumption in Oregon has probative or evidentiary value. *Wyckoff v. Mutual Life Insurance Co.*, 173 Or 592, 598, 147 P2d 227 (1944). It cannot be "overcome" in the usual sense of being made to "disappear from the case" when evidence in opposition to it is introduced. *Stage v. St. Pierre,* 224 Or 395, 399, 356 P2d 432 (1960). Instead, "after all the proofs are in, 'the presumption remains in the case to be considered by the [trier of fact] as evidence.' " *State of Oregon v. Garver,* 190 Or 291, 305, 225 P2d 771 (1950). It is "overcome" at that time only if "other evidence" to the contrary is sufficient to do so. ORS 41.360.

██ The effect of this treatment of presumptions is readily understood (though frequently the subject of contrary views, see discussion in *Wyckoff v. Mutual Life Insurance Co., supra*) when the presumption is the usual one of a single fact or state of facts presumed from other facts proven. Except for the presumption of innocence, all the disputable presumptions in ORS 41.360 are of this type. The presumption of innocence, especially in criminal cases, and our presumption here of an assessment's validity are another breed. They go to the entire merits of the case. Con-

sequently, they are regularly and often joined and confused with the burden of proof, or more accurately the quantum of evidence required to sustain that burden.

■ This melding of the quantum and presumption is intended with respect to the presumption of innocence in criminal cases and, consequently, the presumption and the quantum of the burden are found in the same section. ORS 136.520. However, it is not intended that the state prove its criminal case beyond a reasonable doubt and that, in addition, there be a presumption with probative, or evidentiary, force supporting innocence. This would result in almost no convictions, as the probative force of the presumption taken in the nature of evidence would always create a reasonable doubt. Rather, the presumption is set forth in the same statute because it is an integral part of the quantum of the burden as its *raison d'etre*. The state must prove its case beyond a reasonable doubt because of the presumption of innocence. This presumption, therefore, stays in the case until the verdict is found. *State v. Rosasco,* 103 Or 343, 357, 205 P 290 (1922). Unlike the other presumptions, it does not disappear "when evidence to the contrary has overcome the presumption." *Stage v. St. Pierre, supra.* It remains until the verdict as the reason for the quantum required.

■ There is no like reason for the confusion of the presumption of assessment validity and the quantum of proof required in a tax case. This is a civil presumption, not a criminal presumption—a most substantial distinction. Despite the fact that this tax presumption goes to the very merits of the case, there is no statutory admonition to combine it with the

burden of proof as the reason for the quantum required. If it is kept separate and distinct from that burden, it can be understood.

■ This presumption, as all civil presumptions, is "a deduction which the law expressly directs to be made from particular facts." ORS 41.340. The deduction here is that the assessment of additional tax is valid and it is deduced from the fact that the State Tax Commission so found it. Because it is a presumption, it has probative or evidentiary value, but it can be "controverted by other evidence." ORS 41.360.

> "As said by Mr. Justice Fields in *Lincoln v. French*, 105 US 614, 26 L Ed 1189:
>
> " 'Presumptions are indulged in to supply the place of facts; they are never allowed against ascertained and established facts.' " *Wyckoff v. Mutual Life Insurance Co., supra,* at p. 598.

Whether or not this presumption has been controverted is, except in the most clear-cut case, a question to be decided by the trier of fact. *Wyckoff v. Mutual Life Insurance Co., supra.* It is to be weighed with all the evidence. It is part of the evidence, not a part of either the burden or the quantum of proof.

■ Unfortunately for a clear understanding of tax cases, much of the confusion that exists concerns the proper relationship of the presumption of assessment validity and the burden and quantum of proof in these cases. This confusion has arisen from three causes. First, there is the confusion caused by the dual meaning of the word "preponderance," as noted so clearly in *Cook v. Michael*, 214 Or 513, 526, 330 P2d 1926 (1958). Secondly, the court, as a pronouncement of law, has tried to weigh the presumption in a generalization to describe the quantum of proof necessary to

sustain the burden and the effect of the presumption. This is like trying to state a combined quantity of apples and soda pop in a single measure. The third cause of confusion has been noted above, the function of the presumption of innocence as the *raison d'etre* of the most stringent quantum of proof. Because the presumtion of innocence is the rationale for the burden of proof beyond a reasonable doubt, it has been assumed that the presumption of assessment validity requires some higher quantum of proof. This assumption is not valid, unless the presumption and the quantum of proof are taken as a single concept, which they are not. Practically, a presumption, being evidence, requires evidence to controvert it, and also practically, the quantum of evidence is a measure of evidence. However, legally and conceptually the quantum does not change because of the existence of a presumption. The quantum is fixed. The evidentiary presumption, as distinguished from the "pure" presumption, tends either to assist or to defeat the proponent in amassing the quantum necessary to sustain his burden. It does not alter the quantum.

In its proper office, then, the presumption of assessment validity is evidence. It can be overcome or controverted. It must be weighed by the trier of fact. Before the trier of fact can intelligently weigh the presumption, he must know the quantum of proof required to sustain the burden of proof.

## QUANTUM OF PROOF

Obviously, if confusion exists as to the presumption discussed above because it is not clearly distinguished from the quantum of proof, a like confusion exists as to the quantum. As pointed out by Mr. Jus-

tice O'Connell, in *Cook v. Michael, supra,* at p 526, part of the problem lies in the almost dichotomous meanings of the term "preponderance." In one sense, that referred to in the quotation in that opinion from *Larson v. Jo Ann Cab Corporation,* NY App, 209 F2d 929, the term "preponderance" is a latinism for "weigh more" and is "merely a way of stating that the proponent has the burden of proof."

 In another sense "preponderance" is one of the three gradations of quantum of proof. Its meaning in this sense is defined as follows: (*Cook v. Michael, supra,* at pages 526-7)

"* * * But as pointed out earlier in this opinion, the word 'preponderance' may be used to describe, not simply the broad idea that the proponent's evidence must 'weigh more', but it is an attempt to describe the *degree* of weight which must characterize the evidence before the proponent can win. In this latter sense the phrase 'preponderance of the evidence' is contrasted with two other phrases, viz., 'clear and convincing' and 'beyond a reasonable doubt.' These expressions name the three degrees of proof in three classes of cases. In ordinary civil cases the degree of proof required is a preponderance of the evidence; in some types of cases, such as those involving the issue of fraud, many courts require 'clear and convincing' evidence; and in criminal cases guilt must be established 'beyond a reasonable doubt.' Each of these is a *different* degree of proof. They may be regarded as designating degrees on a graduated scale, with 'preponderance' at the lowest end of the scale, 'reasonable doubt' at the highest end, and 'clear and convincing' in the middle. The degrees dealt with here are degrees of probability—the probability of the truth of the proposition being asserted, and the three phrases used by the courts in instructing juries purport to inform the jury of the *amount of*

*belief* which they must have in order to find for the person with the burden of proof. In this sense, proof by a 'preponderance of the evidence' means that the jury must believe that the facts asserted are more probably true than false; proof by 'clear and convincing evidence' means that the truth of the facts asserted is highly probable; and proof 'beyond a reasonable doubt' means that the facts asserted are almost certainly true. * * *"

Thus, the Oregon court has distinguished the burden and the quantum or degree of that burden. The burden is a responsibility placed upon the one having the affirmative of the issue. ORS 41.210. The quantum or degree of proof is the degree of probability of the truth of the proponent's cause which he must create in the mind, singular or collective, of the trier of fact to sustain that burden. As discussed above, a presumption is legally created evidence which the trier of fact must weigh and consider in determining whether the requisite degree of probability is attained to sustain the burden of proof.

### Caveat re: Property Tax Cases

In many property tax cases the court has combined the presumption and the quantum of proof and has required that the taxpayer prove his case by "clear and convincing" evidence. See *Appeal of Kliks, supra.* Because the statutes have been amended and the appellate processes substantially modified, a full discussion of these concepts and these cases is not appropriate in this case. Suffice it to say that frequently the quantum of proof pronouncement was an attempt to combine the effect of limitations upon judicial review under a procedure dissimilar to that presently applicable, the effect of the presumption of assess-

ment validity, and the quantum of proof required, all in a single measure. For this and the reasons of statutory and administrative dissimilarity, these measurements of degree of probability of truth are not applicable in the instant case.

### Multi-State Income Allocation Cases

Strangely enough, the quantum of proof required in income tax cases in Oregon is discussed in only three cases. *Consolidated Freightways, Inc. v. State Tax Commission, supra; A. C. Dutton Lumber Co. v. State Tax Commission, supra; Hines Lumber Co. v. State Tax Commission,* 215 Or 453, 336 P2d 75 (1959). Their conclusions are substantially identical. All three are corporation excise tax cases involving the allocation of income to Oregon of a multi-state corporation doing a unitary business, and in the latest, *Consolidated Freightways, Inc. v. State Tax Commission, supra,* at p 384, the court said:

> "It is not arguable that a taxpayer who would upset the taxing authorities [sic] apportionment of income for tax purposes must show the apportionment to be arbitrary and unreasonable by a clear and convincing preponderance of evidence. The taxpayer's burden of proof is a heavy one. [Citing cases.] * * *"

These decisions raise the question of whether or not this "heavy burden" is intended for all income tax cases or is limited to the allocation cases then before the court.

▆▆▆ Allocation cases are readily distinguishable from the "garden variety" of income tax cases and the reason for a possible extra burden is obvious in their very nature. In *Hines Lumber Co. v. State Tax Com-*

*mission, supra,* at 469, Mr. Justice PERRY said, in explaining the peculiar need for the extra heavy burden on the taxpayer:

"The Supreme Court of the United States, in referring to the use of a formula to determine the proportional part of the total income of a multi-state corporation attributal to the business carried on within a given state, stated:

" '* * * The difficulty of making an exact apportionment is apparent and hence, when the State has adopted a method not intrinsically arbitrary, it will be sustained and arbitrary application in particular cases.' *Hans Rees' Sons v. No. Carolina,* 283 US 123, 51 S Ct 385, 75 L ed 879.

"It seems clear that the words 'unreasonable and arbitrary' as used in that opinion refer to a situation where the formula may demonstrate on its face or by application that its use clearly taxes the income of a multi-state corporation earned elsewhere than in the taxing jurisdiction. If this appears, then the method adopted violates the Federal Constitution and cannot be sustained. [Citing cases.]"

In other words, two substantial reasons can be found for imposing such a burden upon a taxpayer in an allocation case: (1) a determination by the court that the taxing body has allocated to the state for taxing purposes more of a multi-state corporation's income than is attributable to its operations in the state necessarily embodies a determination that the taxing body is attempting to tax income earned without the tax jurisdiction, thus violating the Federal Constitution; and (2) the court presumes an allocation statute to be constitutional, unless it is on its face intrinsically arbitrary, and if not defective on its face, its application will not be deemed unconstitutional, unless the result obtained from such application is arbitrary and

unreasonable. It is elementary that the constitutionality of a statute and its application are both supported by a very strong presumption. *State ex rel Overhulse v. Appling,* 226 Or 575, 585-6, 361 P2d 86 (1961).

■ Actually, no extra or heavier degree of proof was required in these allocation cases. Mr. Justice PERRY mentioned none. The language used by Mr. Justice SLOAN was "a clear and convincing preponderance," not "clear and convincing evidence." When analyzed carefully in the light of other decisions, his distinction is clear. The decision in *Consolidated Freightways, Inc. v. State Tax Commission, supra,* was handed down less than four years after *Cook v. Michael, supra.* Mr. Justice SLOAN, who wrote the former, sat on the latter case, and Mr. Justice O'CONNELL, who wrote the latter, sat on the former case. Both concurred in the other's opinion. Mr. Justice O'CONNELL, in *Cook v. Michael, supra,* at pages 527-8, said:

"* * * It becomes apparent, therefore, that an instruction which charges the jury that proof must be established by a 'preponderance of the clear and convincing evidence' is not only confusing to the jury, but is illogical as well, if the word 'preponderance' is taken to mean a degree of belief. This is so because if the expressions 'preponderance of the evidence' and 'clear and convincing evidence' convey the idea of two distinct degrees of belief which must be generated in the jurors' minds, it is improper to treat the latter expression as a part of the former. For this reason, when the proposition to be proved must be established by clear and convincing evidence, we regard it as improper for the trial court to use the word 'preponderance' in any of the instructions relating to that proposition. * * *"

The opinion in *Consolidated Freightways, Inc. v. State Tax Commission, supra,* is not a jury instruction. It is instruction to courts, taxpayers, and the commission. The term "clear and convincing preponderance" was used intentionally in the light of *Cook v. Michael, supra,* and its meaning is made clear by *Cook v. Michael.* Mr. Justice SLOAN in the *Consolidated Freightways* case was not establishing a new quantum of proof. He was not, in the face of *Cook v. Michael,* saying that the case must be proved by the "highly probable" degree of proof. Instead, he was pointing up the combined effect of the normal quantum of proof, the very strong presumption of constitutionality, and the presumption of assessment validity. In that brief phrase, he said that to sustain his burden by the preponderance of the evidence, the taxpayer must adduce sufficient evidence which will "weigh more" than the combined weight of all the evidence adduced by the commission, of the presumption of assessment validity, which has evidentiary value, and of the presumption of constitutionality, which has strong evidentiary value. The taxpayer will have to do this, if his evidence is to preponderate, to establish that the facts asserted by him "are more probably true than false." Mr. Justice WARNER's requirement of "clear and cogent evidence" requires no more. *A. C. Dutton Lumber Co. v. State Tax Commission, supra.* He was quoting from Mr. Justice Cardozo in *Norfolk and Western Railway Co. v. North Carolina,* 297 US 682, 56 S Ct 625, 1 STC 152 (1936) who was pointing up the problem of proving an allocation formula unconstitutional. Indeed, in allocation cases, when faced with two presumptions, including that supporting constitutionality, Mr. Justice SLOAN spoke no less than the truth when

he said: "The taxpayer's burden of proof is a heavy one."

## The Average Tax Case

In the "garden variety" of income tax cases, that burden is not as heavy. The quantum of proof or degree of probability is the same, a preponderance. The taxpayer still must prove his case by a preponderance of the evidence, by a degree of proof which establishes that the facts asserted by him "are probably more true than false." To do this he must adduce sufficient evidence which will weigh more in the mind of the trier of fact than the combined weight of the evidence adduced by the commission and the presumption of assessment validity. In the sense of the quantity and quality of evidence, this requires either or both a greater quantity or better quality than the average civil case, but it does not require that the burden of proof be sustained to a higher degree of probability as well.

To require more would defeat the intention of the legislature. Even prior to 1961, the proceeding for judicial review of income tax assessment was *de novo*. No transcript of testimony from the commission hearing goes before the court. The court hears the testimony originally. ORS 314.460. In 1961, the Oregon Tax Court Act continued the income tax proceeding *de novo*, provided *de novo* proceedings in property tax cases, and otherwise indicated a legislative intent that a full and impartial trial be had in all tax cases. To require the taxpayer prove his case by more than a preponderance, to require proof by "clear and convincing evidence," by facts showing the truth of his case to be "highly probable," and also to face him with the presumption of validity of the assessment would

be to return the judicial review of tax cases to the writ of review situation in its most restricted form, following the decision in *Garnsey v. County Court,* 33 Or 201, 54 P 539, 1089 (1898). The whole legislative course in the field of judicial review of tax cases in recent years has been in the opposite direction, toward greater, independent, unfettered judicial review to insure the lawful and equiptable application of the tax laws.

After all, as noted earlier, the presumption of assessment validity is not an ordinary presumption of the existence of a fact. It is a presumption of the validity of a determination of the very question before the court. That its validity should be presumed is ample protection for the public revenue: *Appeal of Kliks,* 158 Or 669, *supra.* It creates an obstacle for the taxpayer easily sufficient to forestall the harrassment and disruption of public finances by petty technicalities. The burden of adducing enough weight of evidence to overcome by a preponderance the weight of the commission's evidence and the weight of the presumption is heavy enough. A greater burden would have the practical effect of destroying the remedy. Even a burden of this magnitude may be contrary to the legislative intent.

### Cases in Other Fields

 Higher degrees of probability required in other fields might appear at first glance to support by analogy a higher degree of proof in taxation. A careful consideration of these fields, however, discloses dissimilarities in each which do not justify the transfer of the higher quantum of proof. For instance, fraud cases come readily to mind, because in many states judicial review of tax cases is based upon con-

structive fraud. This is not the view held in Oregon. Furthermore, the higher degree of probability required in fraud cases is not based upon a presumption. It is often said that, to prove fraud, clear and convincing evidence is required because fraud is never presumed. The latter clause is not a presumption as presumptions are defined in Oregon. Instead it is a maxim. Thus, in this commonly quoted sentence, the lack of a presumption does not create the quantum required, rather the maxim justifies the quantum.

Other types of appeal lie to the Oregon courts from administrative agencies. Probably the most frequent is the appeal from the State Industrial Accident Commission under the Workmen's Compensation Act. Here again there is a clear presumption in favor of the commission's finding. *Dimitroff v. State Industrial Accident Commission,* 209 Or 316, 340, 306 P2d 398 (1957). It does not affect the quantum of proof required. The plaintiff has the burden of proving his case by a preponderance. *Larson v. State Industrial Accident Commission,* 209 Or 389, 400, 307 P2d 314 (1957). These are cases of a lay jury trial of a technical matter already ruled on by a technically proficient agency. From these two decisions, it is apparent that the Supreme Court deems the presumption and a preponderance adequate protection for the state accident fund. The Oregon Tax Court is designed as an expert court. Income taxpayers appealing to it certainly should not be placed under a heavier burden than workmen appealing to a lay jury.

## Weight of Presumption

The remaining question is: What weight should be given to the presumption of assessment

validity? Obviously, no fixed weight can be established. It has evidentiary value and must be weighed with, and in light of, all the other evidence adduced. It should not be accorded the same weight in a trial *de novo* before an expert court that it would be accorded upon a review of the record before a busy, non-expert tribunal. With different evidence before it, either more or less or of a different nature, than the evidence presented to the commission in its hearing, this court hardly can determine whether or not it agrees with the finding made by the commission on the evidence there presented. Instead it must decide the case on the evidence presented in this court. This is the determinative record, not only here but upon appeal. The only rule feasible under these circumstances, and the rule which must prevail here, is that the trier of fact will assign to the presumption such weight as the facts and circumstances of the case warrant.

## Method of Overcoming the Presumption

■ Because the presumption in Oregon is evidentiary in nature and is not removed from the case until all evidence is in, if at all, the task facing the taxpayer is not that which obtains in the "pure" or Thayer-Wigmore presumption jurisdictions. Instead, there appear to be three methods of sustaining the taxpayer's burden in the face of an Oregon presumption. He can ignore the presumption itself and seek to adduce evidence of sufficient weight to outweigh the commission's evidence and the presumption. Secondly, he can attack and destroy the presumption directly with evidence proving the inaccuracy of the very evidence upon which the commission acted, and then, having disposed of the presumption, adduce more

weight of evidence on the issues before the court than the commission adduces. A third course of action is a combination of the other two. He can weaken the presumption by attacking its basis and seek to outweigh the commission's evidence and the weakened presumption. In this case, the taxpayers adopted the first course—sought to overcome the combined weight of the presumption and the adverse evidence by the weight of their evidence. In detail the evidence presented showed the following facts.

## EVIDENCE

Robert Sproul and the decedent were brothers-in-law, Sproul having married Williams' sister. Sproul is a cattle rancher in Grant County, and during the year 1958, he owned certain lands used by him in cattle raising in that county.

He and his brother-in-law owned contiguous lands which they had purchased from Williams' father in 1938 or 1939. Actually, the two of them had worked out the arrangement between them as to how the land should be divided, had a contract prepared, and ultimately in 1944 deeds were exchanged to this land.

The land in question, out of which the shooting arose, is diagramed in Exhibit 4, substantially as follows on page 70 of this decision.

The land to the left (or west) of the boundary between the Sproul and Williams' properties belong to Williams, and that to the right (or east) belonged to Sproul. A road, marked "A" on the diagram, ran from the south out of Sproul's property onto Wililams' property and back again onto Sproul's property. The testimony indicated that for many, many years this road had been used by the owner of the property to

go from the southerly field to the northerly field of Sproul and that various others, including some members of the public, had used the road from time to time. Any public use of the road had been abandoned substantially long before 1958, but at no time prior to June of 1958 had the right of the plaintiffs to use the road in question been raised.

Sometime shortly prior to June 21, 1958, Williams piled rock barriers at the three locations shown on

PLAINTIFF'S EXHIBIT 4

the diagram across the road where it crossed his property. When this occurred and Sproul became aware of it, he consulted Orval Yocom, Esquire, an attorney in John Day, Oregon, as to his rights concerning the road and his right to remove the rock barriers. Yocom advised him that he had a full right to continue to use the road and remove the rock barriers. Yocom further advised Sproul to talk with Williams about it before undertaking to remove the barriers or to make further use of the road.

Sproul then did talk with Williams and advised him of his intention to use the road, based upon the advice of counsel. He told Williams that he intended to remove the rock barriers. In reply, Williams stated that he would not allow Sproul to use the road further and that he would kill Sproul if he did attempt to move the barriers or use the road.

Concerned by Williams' reaction, Sproul next day went to Baker, Oregon, to see David Silven, Esquire, an attorney of that city. After explaining the situation to him, Silven advised Sproul substantially as he had been advised by Yocom in John Day, that he had a right to use the road, and that he had a right to remove the rock barriers.

Returning from Baker to Canyon City, and still concerned, Sproul sought out the Sheriff of Grant County to advise him of the situation. It then was after office hours, and Sproul found the sheriff in the "Pastime," an establishment across the road from the courthouse. Apparently, during the afternoon the sheriff had had a conversation with Williams, in which Williams had indicated that he would kill Sproul, if he removed the rock barriers. After discussing the situation, Sproul and the sheriff attempted to locate

any attorney who was representing Williams or would be able to talk Williams into another course of action. They were unable to locate any attorney representing Williams, but in attempting to do so, they discussed the matter with Roy Kilpatrick, Esquire, an attorney in Canyon City, Oregon. Even though they learned that he did not represent Williams, Sproul and the sheriff discussed with Kilpatrick the possibility of obtaining a peace bond or committing Williams to the State Hospital. After a full discussion, Kilpatrick and the sheriff both advised Sproul that neither of these alternative courses was feasible or advisable under the circumstances.

This left Sproul on the night of June 20, 1958, in this position: He had been advised by two very competent counsel that he had a right to use the road and that he had a right to remove the rock barriers from the road; and he had been advised by the sheriff and another very competent counsel that he had no immediate recourse in any legal proceeding. Yocom in John Day and Silven in Baker apparently discussed with Sproul the possibility of litigation and indicated the length of time that would be involved. Within a week or two the hay on the northern field would be ready for harvest, which would have to be accomplished fairly quickly or the crop would be lost.

Consequently, on the morning of June 21, 1958, Sproul, armed with a Luger pistol and with a rifle in his vehicle, drove out to the road in dispute with the purpose in mind of removing the rock barriers from the road with a Caterpillar tractor and blade, which he had in the northerly field. When he arrived at the field lying south of the Williams' property, he found that both Williams and another brother of his

wife were there. The testimony showed that his wife had sought the help of her brother in keeping Sproul and Williams from violence. Williams was armed with a rifle and two revolvers. Sproul drove to his boundary fence on the road where it crosses into Williams' property. He stopped his vehicle, reached in and took out his rifle, and advanced towards Williams. A discussion followed in most heated terms between Williams and Sproul, in which Williams threatened again to kill Sproul if he attempted to remove the rock barriers.

After this threatening interchange during which the other brother-in-law tried to keep between Sproul and Williams, Sproul backed away toward his truck. He could not swear what his intention in this tense situation was, but he believed that he intended to get into his vehicle, drive around to the Caterpillar across his own property and off the road, get onto the Caterpillar, and then come down the road removing the rock barriers from the road.

In any event, just as Sproul reached the fence line and lowered his rifle, Williams swung his rifle toward Sproul, and they fired at each other. Sproul could not testify as to who fired first.

Following the shooting, Sproul was arrested, charged with first degree murder, tried, and acquitted upon a plea of self defense.

In the testimony elicited by the State Tax Commission, some effort was made to show access to the field north of the Williams' property by another road. The testimony showed that it would have required a very circuitous route of over 15 miles to go from one field which was a quarter of a mile along the disputed road from the other field. The state also sought to

show that vehicles could be taken off the road and around from one field to another across land owned by Sproul. The testimony is in some conflict, but apparently tractor-type vehicles could make such a trip but at many times of the year tube-tired vehicles could not.

Although the commission contended that there was ill will between Sproul and Williams, there is no evidence of bad feeling between them before the road dispute.

Two witnesses testified as to the usual standard of conduct in road disputes in Grant County. The attorney, Kilpatrick, testified that he had advised the sheriff against both a peace bond and an insanity commitment of Williams. He said that, in his 27 years of practice in Grant County, he had always advised against a peace bond because it merely tended to inflame the trouble maker while the bad roads, poor communications and sparse settlement in the area made the bond unenforceable. He told of frequent threats of violence in road and other disputes, including two repeated threats of murder. He said that the threats were so common and they were so rarely carried out that he had become "callous" to them. Both Kilpatrick and the other witness, Herman Oliver, testified that the average Grant County rancher would have ignored the threats and removed the barriers himself.

Herman Oliver is an acknowledged expert on Grant County, its lore and customs, a resident of the county for 77 years, presently the Mayor of John Day, a long time leader among the ranchers of eastern Oregon, a prominent Oregonian generally, and the author of a book on Grant County history entitled *Gold and Cattle*

*Country*. The import of his testimony was that Sproul's conduct leading up to the shooting was "ordinary" in the terms of Grant County cattlemen and was that of a reasonably prudent Grant County rancher in the circumstances of this case.

Furthermore, both Kilpatrick and Oliver testified as to the necessity of Sproul's conduct. The facts established his right to the use of the road and also established the great distance between the fields on other roads, the relative impossibility of traversing off the road and the coming need to harvest the hay. Kilpatrick testified that he frequently advised his clients to do just what Sproul sought to do, to remove such barricades themselves. This was part of starting the trial of such a matter.

## DEDUCTION SUSTAINED

The commission offered no evidence on the Grant County standard of conduct. While its cross-examination sought to weaken the testimony of Kilpatrick and Oliver, their long familiarity with the community and its ways still warrants substantial belief, especially in the face of a failure to produce any evidence to the contrary. This testimony goes to the essence of the commission finding, i.e., that Sproul had not acted as a reasonably prudent man. While the commission finding is entitled to presumed validity, it alone cannot supersede contrary, competent, factual evidence entitled to belief. *Wyckoff v. Mutual Life Ins. Co., supra*. The presumption standing alone fails in the face of the uncontradicted testimony of Kilpatrick and Oliver, not just because they testified, but because the substance of their testimony inherently and their experience and qualifications justify belief.

Without contrary testimony, their testimony ascertained and established as a fact the reasonably prudent man's conduct in Grant County. As Mr. Justice Field noted, (quoted in *Wyckoff v. Mutual Life Ins. Co., Supra*) a presumption cannot prevail against ascertained and established facts.

Certainly Sproul was concerned by the threats. He first clearly established his legal position. Then he sought out the sheriff for help. These are not the acts of a headstrong battler. He took the recognized course of self-help only after exhausting the other remedies available before he needed to prepare for haying. Furthermore, Williams apparently had no general reputation for violence. He was Sproul's brother-in-law and would be thought to be less likely than a stranger to take the life of his sister's husband. He could be expected to stand up to Sproul, perhaps even engage in a fist fight, but using his firearms in the ultimate seemed unlikely. As Kilpatrick testified, it was usual for Grant County people to try out each other's resolve before resorting to the courts. Both Sproul and Williams expected such a mutual testing of intentions and resolutions. Dire threats of physical violence to emphasize this resolve were commonplace. Thus, in the customs of Grant County the whole matter could have been expected to reach some settlement after a satisfactory exchange of angry words, threats, and irritating actions, had Williams not swung up his rifle.

The conduct of both Sproul and Williams is not that of western Oregon, nor is it to be commended or condoned. Morally, the whole transaction from the erection of the first stone barricade is reprehensible. Our courts are the place to settle such disputes and to try the rights to roads. But the law and morals

are not inherently coterminus. Dean Pound said in *Justice According to Law,* page 6:

> "\* \* \* Thus justice and law are looked on as purely moral ideas. Such was the teaching of the eighteenth-century law-of-nature school of jurists. This confuses the ideal relation among men with the ideal development of individual character. What are faults in morals may or may not manifest themselves in tangible infractions of the ideal relation among men, and so may be out of the sphere of the legal adjustment of relations and ordering of conduct. All the conflicts and overlappings of expectations that the law must resolve are not a mere matter of applying moral precepts. If it were, the task of lawyer and judge would be an easy one. It is far from true that every law or every legal precept is or can be declared or applied morals. \* \* \*"

The immorality of these actions is not to be confused with the legality of the conduct or legal validity of the deduction. That a man incurs a business expense because he does not turn the other cheek does not destroy the expense's deductibility.

In this case, even under the strictest rule propounded by the commission, the expense of this litigation is deductible. The reasonableness of the amount of the fee was never questioned. The expense is admittedly connected with the taxpayer's business. It was established by a preponderance of all the evidence including the presumption that in his business activity Sproul was acting in the manner ordinary among ranchers in Grant County and necessary, i.e., "appropriate and helpful," to preserve necessary rights for his business.

By finding that the evidence, despite the presumption favoring the commission, preponderates in favor

of the taxpayers even on the commission's theory of the law, this court does not decide whether or not the commission's finding as to the law is correct. This matter becomes moot in the face of this evidence. Certainly, the language of the Supreme Court in the *Heininger* and *Bingham's Trust* cases, *supra,* raises some doubts as to its validity.

## CAPITALIZATION

The final issue is raised by the commission's contention that, if allowed at all, the litigation expense should be capitalized. The federal statutory and regulatory language and that of Oregon is identical. The statutes, IRC, sec 263 and ORS 316.375, do not allow deductions for "any amount paid out for new buildings or for permanent improvements or betterments, made to increase the value of any property or estate." In interpreting this language in the regulation (Reg sec 1.263(a)-2 and Reg 6.375(2)), both the Commissioner and the State Tax Commission have expressly ruled that "the cost of defending or protecting title to property" is nondeductible and must be capitalized.

There being no Oregon cases in point, we are again dependent for guidance on the federal cases. Unfortunately, these cases are of little help. As noted by one writer, "the administration by the lower courts of this area of the law is hopelessly confused * * *." Though no U. S. Supreme Court case is directly in point, "some of the light which should be found" in the general language of *Kornhauser v. U. S.* and *Bingham's Trust v. Commissioner,* both *supra,* "has not yet been perceived." Brookes, *op cit,* p 263.

The federal confusion stems from the U. S. Tax Court tending to apply the federal regulation me-

chanically. The U. S. Tax Court has held the expense nondeductible if the litigation involved title to property in any way, and has extended "property" to include cash recoveries of capital. *The Penroad Corporation v. Commissioner,* 21 TC 1087 (1954). Other federal courts have not always followed the Tax Court and have laid emphasis on the statutory language and the *Kornhauser* and *Bingham's Trust* decisions, rather than the regulatory language. *Rassenfoss v. Commissioner,* 158 F2d 764, 35 AFTR 555 (7th Cir 1946); *Hochschild v. Commissioner,* 161 F2d 817, 35 AFTR 1373 (2d Cir 1947).

In the instant case, the issue in dispute between Sproul and Williams was an easement, a distinct property right. *Steelhammer v. Clackamas County,* 170 Or 505, 515, 135 P2d 292 (1943). Sproul was not, as the plaintiffs contend, merely engaged in the repair of the road. The obstruction was purposely placed there by Williams to exclude Sproul from his established use of the road. Under the defendant's theory of the regulations and the Tax Court decisions, the litigation costs to establish or defend this easement should be capitalizable and would be nondeductible, even though the attack on the title was unexpected and the title had been secure for many years.

However, the litigation in question here did not pertain to the easement dispute and did not decide, or in any way affect, the title to the easement. Sproul had no greater or more secure right to the easement after his acquittal than he did before it—unless one can deem the continuation of his life as perfecting or defending his title to all his properties. The acquittal neither affirmed nor denied Williams' claim to a right to close the road. The sole issue of the case of *State v. Sproul* was whether or not Sproul was legally

guilty of the crime of murder in the first degree. The fact that the shooting arose out of a title dispute does not make the litigation expense in the murder trial a "cost of defending or perfecting title to property," even under the Tax Court theories.

The result obtained by capitalization certainly makes no sense. The acquittal extended Sproul's life expectancy to its natural limits. It did not affect the title to any property right. If the expense were capitalized, to what would it be added and over what (or whose) life would it be ammortized or depreciated? The impossibility of the result of such a rule makes the adoption of the rule impossible.

In summation, accepting, without deciding for, or adopting, the commission's position that the taxpayer was required to act as a reasonably prudent man in Grant County in 1958 in his business activity leading up to the shooting, the evidence establishes by a preponderance, giving due consideration to the evidentiary value of the presumption of assessment validity, that Sproul acted as a reasonably prudent man in Grant County in his business-connected activity out of which the shooting arose and that he was acquitted of the crime charged and that the costs of his defense of the criminal charge were, therefore, clearly ordinary and necessary. Further, the court finds that the cost of defense is an ordinary business deduction in 1958 and is not required to be capitalized.

A decree will be entered herein under Rule 31 abating the additional assessment against the taxpayers in accordance with this decision.

Dated this 31st day of August, 1962.*

---

* Foregoing case appealed. Oregon Supreme Court opinion found in 234 Or 567, 382 P2d 99 (1963).